ROBERT C. WADMAN, APPELLEE, V. CITY OF OMAHA ET AL.,
APPELLEES, FRANK JACKSON, INTERVENOR-APPELLANT.
438 N.W.2d 749

Filed April 21, 1989.   No. 87-339.

Thomas F. Dowd, of Dowd, Fahey, Dinsmore & Hasiak, for appellant.

Martin A. Cannon, of Matthews & Cannon, P.C., for appellee Robert C. Wadman.

BOSLAUGH, WHITE, SHANAHAN, and FAHRNBRUCH, JJ., and WITTHOFF, D.J.

SHANAHAN, J.

As the result of a hearing before the Omaha personnel director, Robert C. Wadman was dismissed from his employment as chief of police of the Omaha Police Division (OPD) on account of insubordination in his refusal to sign disciplinary notices directed by the Omaha public safety director, Keith Lant. After the Omaha Personnel Board upheld

Wadman's dismissal, Wadman filed his petition in error in the district court for Douglas County, contending that Lant's directive to Wadman was unreasonable, so that Wadman's refusal to obey the directive was not insubordination. The district court reversed the personnel board's decision and ordered Wadman's reinstatement. When the city decided not to appeal from the district court's decision, Frank Jackson, an Omaha taxpayer, intervened pursuant to Neb. Rev. Stat. § 14-810 (Reissue 1987) and the Omaha Home Rule Charter, art. VIII, § 8.10, which provide that a taxpayer may defend any suit against a city of the metropolitan class (Omaha) if the city refuses to defend the suit. On behalf of the city, Jackson appeals and claims that the district court erred in its conclusion that the evidence was insufficient to sustain the personnel board's findings and order for Wadman's dismissal.

## STANDARD OF REVIEW

In an error proceeding, both the district court and the Supreme Court review an administrative agency's decision to determine whether the agency acted within its jurisdiction and whether relevant evidence in the record supports the agency's decision. *Trolson v. Board of Ed. of Sch. Dist. of Blair*, 229 Neb. 37, 424 N.W.2d 881 (1988); *Stone v. City of Omaha*, 229 Neb. 10, 424 N.W.2d 617 (1988). Evidence supports an administrative agency's decision reviewed in an error proceeding if the agency could reasonably find the facts for the agency's decision on the basis of the relevant evidence contained in the record before the agency. *Trolson v. Board of Ed. of Sch. Dist. of Blair, supra; Stone v. City of Omaha, supra.* In an error proceeding to review a decision by an administrative agency, the reviewing court is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact. *Coffelt v. City of Omaha*, 223 Neb. 108, 388 N.W.2d 467 (1986); *Richardson v. City of Omaha*, 214 Neb. 97, 333 N.W.2d 656 (1983).

## DISCIPLINARY PROCEDURE AT OPD

OPD is part of the Department of Public Safety of the City of Omaha. The public safety director heads the safety department and is the police chief's immediate superior. Omaha Mun. Code, ch. 23, art. III, §§ 23-292 to 23-296 (1980) confers on the safety director the power or authority to discipline

department employees, including OPD employees, by admonishment, reprimand, suspension, demotion, or dismissal.

Specifically, Omaha Mun. Code, *supra*, § 23-294, states:

> A department head may suspend any employee without pay for cause for a period or periods not exceeding sixty (60) calendar days in any twelve (12) months, however, no single suspension shall be for more than thirty (30) calendar days. The department head shall notify the employee concerned and the personnel director in writing not later than one day after the date the suspension is made effective. Such notice shall include the reasons for and the duration of the suspension.

Omaha Mun. Code, *supra*, § 23-296, in part provides:

> A department head may dismiss for cause any regular employee under his jurisdiction by delivering at least fifteen (15) days before the effective date thereof a written statement of reasons to the employee concerned and to the personnel director. If the department head, because of the reasons for the discharge, desires to make an immediate separation from the service he may make a suspension without pay pending discharge.

Under the collective bargaining agreement between OPD employees and the city, police officers involved in a disciplinary action must receive written notice of the reason for the officer's suspension or dismissal from employment. Pursuant to the collective bargaining agreement, disciplinary notice relative to suspension and dismissal is patterned on the notice specified by §§ 23-294 and 23-296 of the Omaha Municipal Code.

The safety director and police chief had developed a longstanding practice in furtherance of the disciplinary process authorized by the Omaha Municipal Code and collective bargaining agreement. When improper conduct by police personnel became known, usually as a consequence of an investigation, the police chief drafted a suggested or recommended disciplinary notice, which indicated the proposed discipline to be imposed; signed the notice "By order of /s/ [police chief]"; and submitted the proposed notice to the safety director for the director's approval and signature. The

chief's proposed disciplinary notice, submitted for the safety director's approval, was only a recommendation. In the absence of discipline actually imposed by the safety director, the chief cannot discipline a police officer by admonishment, reprimand, suspension, demotion, or dismissal. If the safety director disagreed with the chief's recommended discipline, the chief redrafted another disciplinary notice conforming with the safety director's instructions and submitted the redraft to the safety director for approval. In all cases, after approving the disciplinary notice drafted by the police chief and the discipline to be imposed, the safety director returned the approved disciplinary notice to the chief for transmittal to the police officer involved in the disciplinary action. Since at least 1972, all disciplinary notices, specifying the discipline imposed, have been signed by both the safety director and the police chief. The apparent genesis of the police chief's role in transmitting a disciplinary notice is Neb. Rev. Stat. § 14-602 (Reissue 1987), which pertains to cities of the metropolitan class (Omaha) and provides in part: "All orders relating to the direction of the police force shall be given through the chief of police . . . ."

None of the Omaha ordinances, contained in the record presented to the courts in these proceedings, requires a written directive from the safety director to the police chief for commencement of disciplinary action against a police officer or a document issued or signed by the safety director to impose a particular form of discipline authorized under the municipal code.

THE PLAN FOR ARREST OF JOHN HOWELL

In October 1985, OPD Lt. Anthony Infantino met with OPD Officers James Alexander and Tom Martin and gave the officers a memo entitled "Mission Impossible"—an outline of an undercover plan designed by Police Lt. Timothy Dunning for surveillance and arrest of John Howell. Although Alexander and Martin were experienced narcotics and intelligence officers, Infantino assigned the officers to "conduct a covert type surveillance in an attempt to arrest [John Howell] for operating a motor vehicle while intoxicated." John Howell had relatives who held political office, including his father, Sam Howell, Douglas County treasurer, and his

brother-in-law, Michael Boyle, mayor of Omaha. Infantino told Alexander and Martin that the purpose of John Howell's arrest was to provide Howell's relatives with an opportunity to interfere with or obstruct the criminal justice process and that Infantino's superiors as well as the FBI knew about and approved the plan to arrest Howell. Pursuant to the plan and after surveillance of Howell for 8 hours each day during 7 days of surveillance, Alexander and Martin arrested Howell for drunk driving in October 1985. Howell's case went through the court system without incident and resulted in Howell's conviction and sentence for DWI, presumably in late 1985 or sometime in the forepart of 1986.

### THE INVESTIGATION

In August 1986, Alexander and Martin approached Safety Director Keith Lant and told him about the undercover operation which led to Howell's arrest, the underlying plan to involve political figures in improper activity undertaken as the result of Howell's arrest, and possible implication or knowledge of OPD personnel in the undercover operation, including Capt. John Mitchell, Dunning, and Infantino.

Mayor Boyle and Lant ordered an inquiry into the Howell arrest, an investigation led by Wadman with the help of OPD Lts. Dennis Howard and Foster Burchard and the Omaha labor relations director, Tom Marfisi.

During the course of the investigation, Dunning was interviewed by Lant, Marfisi and Burchard concerning the Howell arrest, and was ordered not to discuss his interview with anyone. Notwithstanding silence ordered by the investigators, Dunning contacted Infantino and discussed the interview by Lant, Marfisi, and Burchard. Mitchell was "evasive" in his response to questions during his interview concerning the Howell arrest. A polygraph examination was inconclusive concerning Mitchell's denial of participation in a plot to involve political figures through their improper response to Howell's arrest.

### WADMAN'S REFUSAL

On October 1, 1986, Wadman concluded that there was no plot to involve political figures in misconduct resulting from Howell's arrest and that none of the officers investigated had

violated any OPD policies or procedures concerning the Howell arrest. Consequently, in a memo to Lant, Wadman recommended that no disciplinary action be taken against Mitchell and that Dunning be suspended for 1 day on account of Dunning's discussing his interview with Infantino in violation of the investigators' order to refrain from discussing the interview. Wadman further recommended that Infantino be given a written reprimand for poor judgment exhibited by writing the "Mission Impossible" memo. To his memo Wadman attached the proposed disciplinary notices to Dunning and Infantino.

Later on October 1, Wadman met with Lant, Marfisi, and members of the city's legal department to discuss Wadman's recommendations. Lant conveyed his belief that the investigation showed a plot to involve political figures as the result of the Howell arrest and expressed his opinion that Wadman's recommended discipline for Dunning and Infantino was too lenient. Lant then suggested termination of Mitchell's employment based on Mitchell's improper conduct leading to Howell's arrest and Mitchell's deceptive conduct during the investigation into the undercover plan for the Howell arrest. Lant proposed a 30-day suspension for Dunning on account of Dunning's participation in the plan for Howell's arrest, deceptive conduct during the departmental inquiry into the Howell arrest, and discussing his interview with Infantino notwithstanding the direct order not to discuss his interview regarding the circumstances surrounding Howell's arrest. Lant also proposed a 3-day suspension for Infantino on account of Infantino's participation in the operation for Howell's arrest. Wadman, Lant, and Marfisi discussed other options for disciplining Mitchell, Dunning, and Infantino, but the meeting produced no consensus on the discipline to be imposed. At Lant's request, Wadman returned to his office, where he awaited Lant's decision on the discipline to be imposed. About an hour later, Lant telephoned Wadman and told him that Mitchell's employment was terminated, Dunning received a 30-day suspension, and Infantino received a 3-day suspension. Lant then directed Wadman to prepare the disciplinary notices for Mitchell, Dunning, and Infantino. The notice to Mitchell

stated that his dismissal was the result of Mitchell's "improper conduct surrounding the DWI arrest of John Howell in October of 1985" and Mitchell's "deceptive conduct over the last 30 days in the Internal Security Investigation surrounding the above arrest." The reason for Dunning's suspension, expressed in the disciplinary notice, was:

> During the course of the past month, you have been interviewed concerning your involvement in the arrest of John Howell for a charge of OMVI. On September 3, 1986, you were ordered to refrain from talking about this investigation with any other Police employee. Subsequent to that date, you did in fact discuss the case with another Police employee, thereby disregarding the above mentioned order given to you.
>
> This action is also taken, pursuant to Article 6, Section 1(J), and that during the course of the investigation recited above, you, on two occasions, were not truthful when being interrogated by Internal Security.
>
> Further, this action is taken pursuant to Article 6, Section 1(J), in that you failed to follow any proper procedures in creating and executing the undercover plan, to arrest John Howell, in October of 1985, for DWI, and to "monitor" the case through the Criminal Justice System, to see if anyone would "interfer" [sic] with that process.

In the notice to Infantino, the reason was expressed:

> During the month of October 1985, in collaboration with Lt. Tim Dunning, and others, you created a plan to arrest John Howell for DWI and to watch the case go through the system. That plan, and in particular the memo that you gave to Officers Martin and Alexander, constitutes the . . . violation.

In response to Lant's directive concerning the disciplinary notices, Wadman said: "I won't sign." Lant then told Wadman: "I'll give you an out. You can sign under duress, you can disclaim, you can write anything you want and disagree with my discipline. I need your signature on that document . . . and I'll be down and sign them." Wadman renewed his refusal to sign the disciplinary notices and explained that, based on polygraph

examinations of Mitchell, Dunning, and Infantino, he did not believe that the Howell arrest was a part of a plot to provide political figures with the opportunity to interfere in the criminal justice process, as expressed in the disciplinary notices directed by Lant. Later on October 1, Lant personally issued and signed the disciplinary notices without Wadman's signature.

### DISMISSAL OF WADMAN

As the result of Wadman's refusal to sign the disciplinary notices, Lant sent Wadman the following notice:

> You are hereby suspended as an employee of the City of Omaha and member of the Omaha Police Division for a period of fifteen (15) days pending consideration of my recommendation that you be terminated from City employment. This action is taken because of:

> On October 1, 1986 you were given a direct order by the undersigned to sign and deliver three letters notifying certain individuals that disciplinary action was being taken against them. You were advised by the undersigned that you should sign the letters but were free to indicate thereon, in writing, your disapproval of same and reasons therefor. You were further advised that same was a direct order, yet you nonetheless refused to obey. Your conduct has been deemed to constitute insubordination.

> This action is taken because of your violation of Section 23-291(f) of the Omaha Municipal Code, and because your actions reflect discredit upon the service and are a direct hinderance to the effective performance of City government functions.

Under Omaha Mun. Code, ch. 23, art. III, § 23-291(f) (1980), insubordination is "good cause" to subject a police officer to disciplinary action, but the ordinance fails to define or otherwise characterize *insubordination*.

After a hearing, the city personnel director dismissed Wadman from employment. At the hearing in his appeal to the Omaha Personnel Board, Wadman, through his lawyer, detailed his position:

> Boyle's and Lant's proposal was improper in Wadman's view, and he would not set his name down beside the words "by order of." As Wadman put it, he "would not

sign a lie." It would have been a lie, if he pretended authorship of Lant's document. He does not have a duty to lie for Mr. Lant, direct order or no, and to refuse to do so was not insubordinate.

The Omaha Personnel Board, unanimously upholding Wadman's dismissal, found that Wadman was insubordinate in his refusal to comply with Lant's directive concerning the disciplinary notices to Mitchell, Dunning, and Infantino, which the personnel board described as "a reasonable and lawful order" from Lant to Wadman.

In his petition in error, Wadman alleged several procedural deficiencies concerning the composition of the personnel board, which, according to Wadman, rendered the personnel board incapable of legally determining the validity of the charges against Wadman. Also, Wadman claimed that the personnel board's decision was "erroneous, unsupported by evidence, and unsupported by the law" because Lant's order to Wadman concerning the disciplinary notices was "unreasonable" and Wadman's conduct in refusing to sign the disciplinary notice did not cause any discredit to the OPD or hinder the "effective performance of City government." Finally, in his petition Wadman acknowledged that he lacked "authority to order discipline," but concluded: "Nevertheless, the Mayor and the department head 'ordered' [Wadman] to sign as author of an order, and purportedly discharged him for insubordination when he ethically refused the ultra vivres [sic] order."

Although Wadman did not expressly allege that his signing the disciplinary notices would have been the exercise of authority improperly delegated by Lant, the district court found that, as the result of an absence of guidelines or standards "specifying the conditions under which the delegated discretion could be exercised," there was no valid delegation of the safety director's authority to discipline members of the police department and concluded that "there is no competent evidence to sustain the decision of the Personnel Board upholding the termination of the Police Chief for insubordination." The district court reversed the dismissal order of the personnel board and entered judgment that

Wadman be reinstated to his position as police chief with payment of benefits and wages withheld during his suspension and on account of his dismissal from employment.

## INSUBORDINATION

Although § 23-291(f) of the Omaha Municipal Code fails to define or characterize *insubordination*, we hold that insubordination is an employee's willful or intentional disregard of, or refusal to obey, an employer's reasonable order, rule, or regulation, which is expressed or implied and is given or promulgated under lawful authority related to the employment. *Sims v. Bd. of Trustees, Holly Springs, etc.*, 414 So. 2d 431 (Miss. 1982); *Bd. of Trustees of S. D. No. 4 v. Colwell*, 611 P.2d 427 (Wyo. 1980); *Ray v. Minneapolis Board of Education*, 295 Minn. 13, 202 N.W.2d 375 (1972); *Parrish v. Civil Service Commission*, 66 Cal. 2d 260, 425 P.2d 223, 57 Cal. Rptr. 623 (1967); *Porter v. Pepsi-Cola Bottling Co.*, 247 S.C. 370, 147 S.E.2d 620 (1966); *Cunningham v. Civil Service Comm'n*, 48 Haw. 278, 398 P.2d 155 (1964); *MacIntosh v. Abbot*, 231 Mass. 180, 120 N.E. 383 (1918).

" 'Under the law, an employee is required to obey all reasonable orders of the employer.' " *Stoffel v. Metcalfe Construction Co.*, 145 Neb. 450, 455, 17 N.W.2d 3, 6-7 (1945) (quoting *Bang v. International Sisal Co.*, 212 Minn. 135, 4 N.W.2d 113 (1942)).

An employee's good faith disagreement with the employer's opinion or judgment underlying a reasonable order does not justify the employee's refusal to follow the employer's valid order. See, *Matter of MacMillan v. Morgenthau*, 146 Misc. 588, 263 N.Y.S. 568 (1933) (employee's difference of opinion with employer does not justify refusal to obey the employer's orders); *Siglin v. Kayenta Unified School Dist. No. 27*, 134 Ariz. 233, 655 P.2d 353 (1982).

In substance, Wadman argues that Lant directed him to sign an order imposing discipline on Mitchell, Dunning, and Infantino, whereas only Lant, as safety director, was authorized to impose discipline on police officers. However, Wadman overlooks the salient fact that imposition of discipline, whether suspension or dismissal from employment, is ultimately effectuated by the safety director, not by Wadman.

Because the safety director actually decides whether an officer will be subjected to disciplinary action and determines the particular discipline imposed on the officer, the police chief is only a conduit through which a notice of disciplinary action and the nature of the discipline imposed is transmitted to a police officer. What the district court mistakenly characterized as an impermissible delegation of authority is actually an appropriate directive for transmittal of disciplinary notices through the police chain of command, a statutorily prescribed procedure, see § 14-602, which has been utilized in a longstanding practice of the Omaha Police Division. Although Wadman's consent or approval was unnecessary for imposition of discipline on an officer, Wadman's signature on the disciplinary notices, nevertheless, served an important function in the disciplinary process—compliance with the statutory mandate that orders relating to the direction of the police force must be "given through the chief of police," § 14-602, or, more simply and fundamentally, obedience to law. In the final analysis of the disciplinary process, Wadman made no decision or determination which necessarily resulted in discipline of an officer and had no discretion in the process once the safety director had determined to commence disciplinary action against an officer and had imposed an authorized form of discipline, and Lant did not direct Wadman to make such a determination or decision. Imposition of discipline on Mitchell, Dunning, and Infantino was already an accomplished fact when Wadman was directed to transmit the disciplinary notices to the officers, although, in the case of dismissal as the discipline, the effective date of the dismissal was deferred until 15 days had elapsed after delivery of the disciplinary notice to the disciplined officer. See Omaha Mun. Code, ch. 23, art. III, § 23-296 (1980).

Lant's offer of the disclaimer, if accepted by Wadman, would have left no doubt in the disciplined officer's mind that the originator of the discipline was Lant, not Wadman. Given Lant's allowance of absolute ability for the injection of Wadman's express disagreement into the disciplinary notices in question and the opportunity for Wadman's total disclaimer of approval and responsibility for initiating the disciplinary action

against the police officers, Lant's directive cannot reasonably be construed as an order that Wadman represent himself to be the author of the disciplinary notices. Moreover, Wadman's disagreement with the commencement of disciplinary action or the discipline imposed, even if such disagreement is founded on a good faith opinion, did not justify willful disobedience to Lant's directive.

Consequently, there is relevant evidence to support the personnel board's finding that Wadman willfully or intentionally refused to obey Lant's express directive, which was made under lawful authority pertinent to Wadman's duties as police chief. Thus, there was evidence supporting the personnel board's conclusion that Wadman was insubordinate in his refusal to carry out the directive from Lant.

Implicit in the district court's decision and judgment is the conclusion that the personnel board was empowered to order Wadman's dismissal from employment. Since Wadman has not cross-appealed concerning any of the procedural deficiencies alleged in his petition in error, deficiencies which, according to Wadman, prevented the personnel board from entering a valid order for Wadman's dismissal from employment, we do not reach any issue based on the alleged invalidity of the process by which the personnel board was constituted or ordered Wadman's dismissal from employment.

Therefore, the district court's judgment is reversed, and this cause is remanded to the district court with direction that the court enter judgment, affirming the personnel board's order dismissing Wadman from employment as the chief of police in the Omaha Police Division.

REVERSED AND REMANDED WITH DIRECTION.

BOSLAUGH, J., dissenting.

The issue in this case is whether the order which the director of public safety gave to the appellee Wadman was of such a nature that Wadman was required to obey it. The trial court found that under the circumstances in this case, the order was not a reasonable order and that the appellee's refusal to obey it was not insubordination.

The majority opinion points out that although it has been the custom for disciplinary notices to be signed by both the safety

director and the chief of police, the authority to impose discipline is vested in the safety director and the only disciplinary authority vested in the chief of police is purely advisory.

The order involved in this case was a direct order from the safety director to the appellee to sign three letters which advised the officers addressed of discipline which the safety director had decided to impose upon them. The letters, however, were in the form of letters from the appellee to the officers and concluded with the words, "By order of." Although the safety director informed the appellee that he could "sign under duress" and "disclaim" and "disagree with my discipline," the forms of the letters indicated that the discipline was being imposed by the order of the appellee. The appellee had no authority to impose discipline.

Neb. Rev. Stat. § 14-602 (Reissue 1987), which provides in part that "[a]ll orders relating to the direction of the police force shall be given through the chief of police," in my opinion, does not relate to the imposition of discipline but refers to the operation of the department and the performance of police work.

I would affirm the judgment of the district court.