HILLIS F. MATHES, APPELLANT, V. CITY OF OMAHA,
A MUNICIPAL CORPORATION, AND THE CITY OF OMAHA
PERSONNEL BOARD, AN ADMINISTRATIVE TRIBUNAL, APPELLEES.
576 N.W. 2d 181

Filed March 27, 1998.   No. S-96-377.

Steven J. Riekes, P.C., for Marks Clare & Richards, for appellant.

Kent N. Whinnery, Deputy Omaha City Attorney, for appellees.

WHITE, C.J., CAPORALE, WRIGHT, GERRARD, STEPHAN, and McCORMACK, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

The plaintiff in error and appellant, Hillis F. Mathes, challenges the district court's affirmance of the decision of the

defendant-appellee City of Omaha Personnel Board, which upheld Mathes' dismissal from the employment of the police division of the defendant-appellee City of Omaha. In his appeal to the Nebraska Court of Appeals, Mathes asserted that the district court erred in failing to find that the board wrongly and prejudicially received the testimony of a polygraph examiner. Under our authority to regulate the caseloads of the Court of Appeals and this court, we, on our own motion, removed the matter to our docket. We affirm.

## II. SCOPE OF REVIEW

We have at times declared that where it appears in an error proceeding that an administrative agency of a municipal government has acted within its jurisdiction and there is some competent evidence to sustain its findings and order, the order of the agency will be affirmed. *Hammann v. City of Omaha*, 227 Neb. 285, 417 N.W.2d 323 (1987); *Matula v. City of Omaha*, 223 Neb. 421, 390 N.W.2d 500 (1986). We have also written that in an error proceeding involving the decision of an administrative agency, both the district court and this court review the record to determine whether the agency acted within its jurisdiction and whether there is relevant evidence to support the decision. *Olson v. City of Omaha*, 232 Neb. 428, 441 N.W.2d 149 (1989); *Wadman v. City of Omaha*, 231 Neb. 819, 438 N.W.2d 749 (1989); *Trolson v. Board of Ed. of Sch. Dist. of Blair*, 229 Neb. 37, 424 N.W.2d 881 (1988).

We have defined "competent evidence" to be that which is admissible and relevant on the point in issue or, stated another way, admissible and tending to establish a fact in issue. See, *Hammann, supra*; *Shepherd v. City of Omaha*, 194 Neb. 813, 235 N.W.2d 873 (1975). "Relevant evidence" is defined as that evidence which has any tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence. Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995); *State v. Thieszen*, 252 Neb. 208, 560 N.W.2d 800 (1997); *Menkens v. Finley*, 251 Neb. 84, 555 N.W.2d 47 (1996). Because relevant evidence might nonetheless be inadmissible, as for example, relevant hearsay evidence, the scope of review is better stated in terms of the existence of competent evidence.

## III. FACTS

Mathes was dismissed from his position for conduct unbecoming an Omaha police officer. The behavior in question occurred when he was off duty and riding with his wife in their pickup truck while traveling from Blair to Omaha. While still in Blair, a Suburban vehicle pulled out in front of the Mathes vehicle and cut it off. The driver of the Suburban, Thomas Taylor, made an unfriendly gesture toward the Matheses and, traveling in front of the Mathes vehicle, accelerated, then suddenly decelerated several times. Taylor motioned to the Mathes vehicle to pull off to the side of the road, and Mathes' wife did so. Taylor next pulled back out onto the highway and drove away. The wife was upset by his behavior, and she and Mathes switched places so that Mathes could drive.

Mathes testified that he drove at 55 to 60 miles per hour and caught up with the Suburban, which was traveling at approximately 40 miles per hour at that time. When he attempted to pass the Suburban, Taylor accelerated, then decelerated to keep Mathes from pulling back into the correct lane. The two vehicles drove in that fashion for about a mile. During that period, a vehicle approaching from the opposite direction was forced onto the shoulder because Mathes was driving in the wrong lane of the two-lane highway.

Mathes asked his wife to roll down her window so that he could signal to Taylor to allow him to pull back into the correct lane. Taylor claims that at that point, his window was shot out. The Suburban then ran into the side of the truck.

The authorities took possession of Mathes' 9-mm police handgun, which he had been carrying in his belt but which he had placed under the driver's seat of his truck before the police arrived. Several police officers testified that there was no indication that the gun had been recently fired. In particular, there was no smell of gunpowder as there usually is on guns that have been recently discharged. The gun, which is capable of holding 16 shells at one time, had 1 shell in the chamber and 14 in the clip.

Neither Taylor nor Russell L. Nelsen, a witness to the accident, saw Mathes fire at Taylor's vehicle. However, the authorities found two holes on the inside of the passenger door of the

Suburban which could have been made by a projectile. There appeared to be an indentation in the metal behind one of the holes. When officers removed the paneling from the door, they found a lead slug. They also noticed that the driver's-side window was broken and that glass was scattered in the cab.

Richard Circo, a polygraph examiner for the Omaha Police Division, testified that he found "deception on all of the relevant questions asked" Mathes about the details of the shooting.

A forensic examiner employed by the Federal Bureau of Investigation testified that the slug taken out of the Suburban door was consistent with the weight of a slug of the type of shell found in Mathes' gun after it had gone through a glass window. This expert also testified that the lead used in bullets contains trace amounts of other elements such as antimony, arsenic, copper, bismuth, silver, and tin. The lead for bullets is shipped to ammunition manufacturers in 70-pound billets. Each billet has a unique composition of trace elements so that individual bullets may be matched with other bullets from the same billet. About 4,000 9-mm bullet cores are produced from a billet. The slug found in the Suburban door matched two other bullets found in Mathes' possession.

Mathes and his wife both testified that he did not fire a shot at Taylor. Mathes also presented an expert who test-fired the same type of ammunition that Mathes had in his gun. This expert testified that the lead core found in the Suburban was too light to come from the ammunition Mathes had and that the bullets issued by the Omaha Police Division have a small identifiable spike inside the hollow point, which was lacking in the slug found in the Suburban.

## IV. ANALYSIS

We have long held that the results of polygraph examinations are not admissible as evidence in criminal cases. *State v. Allen,* 252 Neb. 187, 560 N.W.2d 829 (1997); *State v. Walker,* 242 Neb. 99, 493 N.W.2d 329 (1992); *State v. Reynolds,* 235 Neb. 662, 457 N.W.2d 405 (1990); *State v. Houser,* 234 Neb. 310, 450 N.W.2d 697 (1990) (single-judge opinion); *State v. Anderson and Hochstein,* 207 Neb. 51, 296 N.W.2d 440 (1980);

State v. Steinmark, 195 Neb. 545, 239 N.W.2d 495 (1976); *Boeche v. State*, 151 Neb. 368, 37 N.W.2d 593 (1949).

In *Boeche, supra,* we concluded that the scientific principle involved in the use of such examination had not yet gone beyond the experimental stage and had not yet received general scientific acceptance. More recently, we have noted that experimenting psychologists themselves admit that a wholly accurate polygraph examination is yet to be perfected. *Reynolds, supra.*

While *Olson v. City of Omaha*, 232 Neb. 428, 441 N.W.2d 149 (1989), involved a polygraph examination in the context of a police disciplinary appeal, we did not reach the question of admissibility of the results at such hearings. *Olson* was a consolidated disciplinary hearing involving Officers Dunning, Infantino, and Olson. Infantino's polygraph examination results were admitted through the stipulation by both the city and Infantino as to him, but not as to Olson. Olson argued in his appeal that since both hearings revolved around who was telling the truth, he or Infantino, Olson was prejudiced by evidence that Infantino was truthful. However, we noted that the board chair had admonished the members no less than three times that the Infantino polygraph results were not to be considered in Olson's case and, relying on the proposition that errors in the admission of evidence may be cured by an instruction of the court, rejected Olson's argument.

A number of other jurisdictions which have decided this issue have held that polygraph results are inadmissible in administrative hearings. E.g., *Kaske v. City of Rockford*, 96 Ill. 2d 298, 450 N.E.2d 314 (1983); *Zanesville v. Sheets*, 38 Ohio App. 3d 24, 525 N.E.2d 842 (1987); *Tp. of Silver Spring v. Thompson*, 90 Pa. Commw. 456, 496 A.2d 72 (1985). Such truth and deception examinations are not favored under Nebraska law. In fact, their mandatory use by employers is statutorily prohibited except for those engaged in public law enforcement. Neb. Rev. Stat. § 81-1932 (Reissue 1994). Interestingly, Neb. Rev. Stat. § 23-1737 (Reissue 1997) provides not only that deputy sheriffs submit to a polygraph examination upon the commencement of duties and upon certain subsequent requests, but that they "agree to the admission into evidence of the results

of such test or tests in any civil proceeding before the [merit] commission or any court."

Whatever questions might exist about the validity of those statutes, see *In re Interest of Constance G., ante* p. 96, 575 N.W.2d 133 (1998), § 81-1932 does not purport to make the results of polygraph examinations admissible in any proceeding, and it is clear that the scientific foundation needed to meet the *Frye* standard was not laid in this proceeding. See *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994) (under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), proponent of scientific evidence must prove general acceptance by relevant scientific community), *cert. denied* 515 U.S. 1123, 115 S. Ct. 2279, 132 L. Ed. 2d 282 (1995). In addition, courts must be particularly cautious in according evidentiary status to a polygraph examination since the result "is unique in that its truth seeking functions nearly duplicate the purpose of the trial." *People v. Monigan*, 72 Ill. App. 3d 87, 100, 390 N.E.2d 562, 571 (1979). We discern no reason for making admissible in administrative hearings the results of polygraph examinations which are not admissible in criminal cases and therefore hold that the results of such examinations are inadmissible for the purpose of attempting to show deception in a proceeding before an administrative agency of a municipal government.

The board therefore erred in receiving the polygraph examiner's testimony. However, the board made no reference to the polygraph testimony in its findings of fact, and the question becomes whether there exists other competent evidence sustaining the board's findings and decision.

In that regard, we recall that in an error proceeding to review a decision by an administrative agency, the reviewing court is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact. *Olson v. City of Omaha*, 232 Neb. 428, 441 N.W.2d 149 (1989); *Wadman v. City of Omaha*, 231 Neb. 819, 438 N.W.2d 749 (1989).

There is substantial competent evidence exclusive of the polygraph testimony that Mathes fired a shot at the Taylor vehicle. The most convincing evidence, as detailed in the board's order, is that relating to the lead in the slug found in Taylor's

passenger-side door, which matched the lead found in two of the bullets in Mathes' possession. The record demonstrates that it is very likely that all three bullets came from the same 70-pound billet of lead. Additionally, the gun carried by Mathes had room for one more shell. Moreover, the record supports by competent evidence the board's finding that Mathes drove recklessly, forcing a vehicle to leave the traveled portion of the roadway in order to avoid a collision.

## V. JUDGMENT

Accordingly, as first noted in part I, we affirm the judgment of the district court.

AFFIRMED.

CONNOLLY, J., participating on briefs.