IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


GRAHAM V. CITY OF LINCOLN PERSONNEL BOARD


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


TRACY GRAHAM, APPELLANT,

V.

CITY OF LINCOLN PERSONNEL BOARD AND THE CITY OF LINCOLN, NEBRASKA,
A MUNICIPAL CORPORATION, APPELLEES.


Filed January 5, 2016.    No. A-14-990.


Appeal from the District Court for Lancaster County: JODI NELSON, Judge. Affirmed.

Sean J. Brennan, of Brennan & Nielsen Law Offices, P.C., for appellant.

Tonya Peters, Assistant Lincoln City Attorney, for appellees.


MOORE, Chief Judge, and IRWIN and INBODY, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Tracy Graham appeals from an order of the district court for Lancaster County affirming the decision of the City of Lincoln Personnel Board (Board) to uphold the termination of Graham's employment with the Lincoln Police Department (LPD). Because we find no error by the district court, we affirm.

### FACTUAL BACKGROUND

Graham served as a Patrol Sergeant with the LPD prior to her termination. While serving in this position, Graham responded to a call on January 26, 2013 at approximately 6:20 p.m. from Officer Michael Wambold regarding his involvement while on duty in a two-car accident where his LPD cruiser rear-ended another vehicle that was stopped at a stop sign.

Upon arrival at the scene, Graham observed Wambold and the other driver, Jared Betten, seated in their respective vehicles. The front end of Wambold's cruiser was in contact with the rear end of Betten's pickup truck. When Graham initially spoke with Betten, she noticed a faint odor of alcohol coming from him, but did not observe any signs of impairment. Betten admitted to having consumed a few drinks earlier in the day.

There is a factual dispute regarding the conversation that occurred between Graham and Wambold following Graham's arrival on the scene. Graham testified that she asked Wambold if he had smelled alcohol on Betten and Graham's recollection was that Wambold said no. Wambold did not testify at the Board hearing, however, during his interview with the Internal Affairs investigator, Mark Domangue, Wambold indicated that he told Graham he did smell alcohol on Betten. Wambold also told Domangue that he suggested that Graham call another officer to do a DUI investigation on Betten since Graham had not done a DUI investigation in a while and felt that she was out of practice. Graham denied that Wambold suggested she contact another officer to conduct a DUI investigation, although Graham felt it was necessary to address the alcohol issue at the scene and admitted that she had not done a DUI investigation in a long time and probably was not proficient at doing it.

Graham asked Betten to get out of his truck and performed a horizontal gaze nystagmus (HGN) field sobriety test. Graham testified that Betten passed this test. However, Wambold indicated during the investigation that he believed Betten failed the HGN test. Graham also administered a preliminary breath test (PBT), however, she did not comply with the requirements of administering the test. Specifically, Graham did not read Betten the required advisory form or adhere to the 15-minute observation period required to make the PBT admissible as evidence during a court hearing. The result of Betten's PBT was .086, above the legal limit of .08. No other field sobriety tests were administered. Rather than conducting a full DUI investigation, Graham allowed Betten to be taken home by one of his roommates who had not been drinking.

Upon returning to police headquarters, Graham contacted the duty commander, Captain Danny Reitan, to inform him of the accident, including the fact that Betten was over the legal limit. Reitan directed Graham to inform her supervisor, Captain Marty Fehringer, who was off duty at the time of the accident. Graham sent Fehringer a text message, telling him Wambold had been in an accident; he was wearing his seatbelt at the time; nobody was injured; and the other driver was a "little intoxicated." Importantly, Graham did not inform either Reitan or Fehringer of her failure to properly administer the PBT while investigating the accident.

LPD's General Order No. 1930 requires officers to complete and submit a State of Nebraska Motor Vehicle Accident Report (MVAR) by the end of his or her shift unless a supervisor approves a late submission. Graham was required to complete a MVAR as part of her investigation in order to comply with this General Order. Following the accident, Graham worked until her shift ended at 12:47 a.m. She completed a property report regarding pictures of the accident scene, but she did not complete the MVAR by the end of her shift. Graham testified that completion of a MVAR takes approximately 20 minutes. There is no evidence in the record that Graham requested or was granted permission to submit the MVAR late.

The next day, January 27, 2013, Graham became involved in two lengthy investigations and worked five hours past her normal end time without completing the MVAR for Wambold's

accident. Graham worked another officer-involved accident on the 27th and completed the MVAR and two additional case reports for that accident.

On January 28, 2013, Sergeant Santacroce approached Fehringer requesting the January 26 MVAR so that he could check for seatbelt usage in Wambold's cruiser as required by department policy. Fehringer then sent an e-mail to Graham, who was off work at the time, requesting the MVAR. Graham arrived early to work on the 28th, completed the MVAR, turned it in to Reitan, sent a copy to Santacroce, and put a copy in Fehringer's box. Due to differing schedules, Fehringer did not see the report until January 29.

There are two specific boxes on the MVAR Graham completed that are at issue in this case. On the second page of the MVAR, the form requires the investigating officer to report if a driver's alcohol level was tested, and if it was, the form requires the investigating officer to record the BAC level. In this alcohol testing box, Graham marked "n" for no alcohol testing for both drivers involved in the accident and did not record the BAC level for Betten from the PBT. Also on the second page of the MVAR, the form requires the investigating officer to report if alcohol or drugs were suspected. In this box, Graham marked "l" for "neither drugs nor alcohol suspected" for both Wambold and Betten.

On February 1, 2013, after reviewing Graham's completed MVAR, Wambold contacted Fehringer to discuss Wambold's concerns with the information contained on the MVAR, specifically that Graham did not mention the alcohol odor on Betten or the PBT result. Fehringer had noticed these omissions as well, and following this discussion with Wambold, Fehringer sent an e-mail to Lincoln Chief of Police James Peschong and Assistant Chief Brian Jackson outlining his concerns with the information contained in the MVAR.

At the direction of Peschong and Jackson, Fehringer met with Graham on February 4, 2013 to discuss the MVAR and address his concerns with the information contained in the report. During this meeting, Graham explained she had not performed all of the field sobriety tests and did not feel an affirmative response to the question regarding alcohol testing was appropriate. When Fehringer asked her why she indicated that alcohol was not suspected of either driver, Graham said "she didn't have any excuse on why it was marked that way." Graham later testified that she told Fehringer she filled out the MVAR "based on [her] perception at the time of what [she] thought. The officer caused the accident." Fehringer then explained to Graham how she should have filled out the MVAR; specifically, that she should have marked "yes" to both questions relating to alcohol and listed the BAC level since the PBT had been given.

Fehringer prepared a memorandum to Peschong explaining the events of the accident and Fehringer's conversations with Wambold and Graham. At the end of the memorandum, Fehringer advised Peschong that he felt there were critical errors made in allowing Betten to walk away from the accident without a DUI investigation and in the "inaccurate, false information" which was documented in the MVAR.

Shortly after receiving the memorandum from Fehringer, Peschong ordered a Chief's Investigation into the events of January 26 and Graham's completion of the MVAR. The written notification of the Chief's Investigation informed Graham that Domangue would be conducting the investigation which would be "centered on your involvement in processing a potential intoxicated driver and whether there [was] a departure from the truth in the official police report."

- 3 -

During the course of his investigation, Domangue interviewed Betten, Wambold, Graham, and Reitan and researched dispatch records and other reports authored by Graham regarding events on January 26 and 27. Based upon those interviews and other information gathered through the course of his investigation, Domangue concluded that Graham was not truthful with regard to her responses to him and her explanation concerning the inaccuracies on the MVAR, and that Graham violated various LPD general orders and Lincoln municipal code sections. On March 26, 2013, Graham was placed on investigative suspension pending a predisciplinary hearing. On April 11, Peschong notified Graham in writing that the Chief's Investigation had been completed and advised her of the allegations brought against her.

PROCEDURAL BACKGROUND

On April 18, 2013, Peschong conducted a predisciplinary hearing for Graham's alleged violations of LPD General Orders 1930, 1420, and 1425 and Lincoln Municipal Code §2.76,445. The relevant text of these sections is as follows:

General Order 1930(II)(A)

3. Officers shall submit reports that are adequate to document incidents and investigations . . . .

4. All reports will be submitted prior to the end of the officer's tour of duty, unless a supervisor has approved delaying the report.

General Order 1420

6. Employees shall not depart from the truth in making reports, affidavits, court documents, in giving testimony, or in connection with any official duties . . . .

7. When required to do so, employees will make full, accurate, and truthful reports, both written and verbal.

. . . .

17. Employees shall conduct themselves at all times, both on and off-duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming a police officer shall include that which brings the department into disrepute or reflects discredit upon the employee as a member of the department, or that which impairs the operation or efficiency of the department employee.

. . . .

25. Members shall refrain from engaging in conduct in violation of Section 2.76.445 of the Lincoln Municipal Code, which provides any action which reflects discredit upon the city service or is a direct hindrance to the effective performance of the municipal government functions shall be considered good cause for disciplinary action against any officer or employee of the City of Lincoln, though charges may be based upon causes and complaints other than those listed.

Lincoln Municipal Code 2.76.445 Cause for Disciplinary Action

Any action which reflects discredit upon the city service or is a direct hindrance to the effective performance of the municipal government functions shall be considered good cause for disciplinary action against any officer or employee of the City of Lincoln, though charges may be based upon causes and complaints other than those listed.

. . . .

(g) Incompetence to perform the duties of the position.

. . . .

(j) Commission of acts or omissions unbecoming an incumbent of the particular office or position held, which render a reprimand, suspension, demotion, or dismissal necessary or desirable for the economical or efficient conduct of the business of the city or for the best interest of the municipal government.

Regarding General Order 1425, which sets forth the Lincoln Police Code of Ethics, Peschong testified that Graham's actions constituted a general violation of this section without citing to any specific line or section of text.

The predisciplinary hearing was attended by Peschong, Graham and her attorney, Domangue, Lincoln Police Union President Chris Milisits, and Police Legal Advisor Tonya Peters. At the conclusion of the hearing, Peschong found that there was cause for disciplinary action as a result of Graham's late and purposeful completion of a false MVAR in order to cover up her mistakes during the accident investigation. Peschong concluded that Graham violated LPD General Orders 1420, 1425, and 1930 along with Lincoln Municipal Code § 2.76.445(g) and (j). Peschong further determined that Graham's actions harmed her credibility as an officer and potential witness in future cases. Peschong suspended Graham for 15 days pending her termination. On April 18, 2013, the same day as the predisciplinary hearing, Graham was notified in writing of her 15-day suspension pending termination.

On May 1, 2013 Graham appealed the termination of her employment to the Board. The Board hearing occurred on July 18, 2013, during which Fehringer, Domangue, and Peschong testified for the City, and Graham and coworkers Gregory Cody, David Munn, Kenneth Koziol, and Teresa Hruza testified on Graham's behalf. The evidence adduced at the hearing is set forth, in part, in the factual background above. At the hearing's conclusion, a member of the Board requested that either a motion to vote or a motion to deliberate be made. A motion was made to "deny the grievance," and the Board subsequently voted unanimously to "deny [Graham's] grievance and uphold the City's side," thus affirming the City's termination of Graham's employment. The Board issued a written decision on August 6, 2013, in which it referred to the motion as a motion "to deny the grievance [appeal]" and declared that the "termination of Graham's employment with the City is the appropriate level of discipline to be imposed in this matter."

On August 15, 2013, Graham appealed the decision of the Board to the district court for Lancaster County. A hearing before the district court occurred on May 15, 2014. On October 1, 2014, the district court entered a 19-page order affirming the decision of the Board to uphold the termination of Graham's employment.

Further evidence with regard to the accident, predisciplinary hearing, and Board hearing is discussed in more detail below. Graham has timely appealed.

## ASSIGNMENTS OF ERROR

Graham assigns, restated, that the district court erred in (1) finding that the Board applied the correct standard of review; (2) determining that the Board considered and weighed the evidence presented at the hearing; (3) finding that Peschong acted reasonably and that termination of Graham's employment was not arbitrary or capricious; and (4) failing to conclude that termination of Graham's employment was excessive.

## STANDARD OF REVIEW

In reviewing an administrative agency decision on a petition in error, both the district court and the appellate court review the decision to determine whether the agency acted within its jurisdiction and whether sufficient, relevant evidence supports the decision of the agency. *Kaapa Ethanol v. Board of Supervisors*, 285 Neb. 112, 825 N.W.2d 761 (2013).

The reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact. *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012). The evidence is sufficient, as a matter of law, if an administrative board could reasonably find the facts as it did from the testimony and exhibits contained in the record before it. *Id*. The credibility of witnesses and the weight to be given to the evidence presented are determinations to be made by the administrative agency as the trier of fact; it is not the province of the Supreme Court to resolve conflicts in the evidence. *Olson v. City of Omaha*, 232 Neb. 428, 441 N.W.2d 149 (1989). See, also, *Mathes v. City of Omaha*, 254 Neb. 269, 576 N.W.2d 181 (1998).

The determination of whether the procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law upon which an appellate court is obligated to reach a conclusion independent of the court below. *Fleming v. Civil Serv. Comm. Of Douglas Cty.*, 280 Neb. 1014, 792 N.W.2d 871 (2011); *Hickey v. Civil Serv. Comm. of Douglas Cty.*, 274 Neb. 554, 741 N.W.2d 649 (2007).

## ANALYSIS

### GENERAL PROPOSITIONS

Before addressing each of Graham's assignments of error, we set forth the general legal propositions that control in this case. First, with regard to the issues implicating Graham's due process rights, we recognize the following: When a public employer deprives an employee of a property interest in continued employment, constitutional due process requires that the deprivation be preceded by (1) oral or written notice of the charges, (2) an explanation of the employer's evidence, and (3) an opportunity for the employee to present his or her side of the story. *Hickey, supra*. See, also, *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487 (1985). After *Loudermill*, courts have concluded that procedural due process claims are divided into three stages: pretermination process, actual termination, and posttermination process. *Scott v. County of Richardson*, 280 Neb. 694, 789 N.W.2d 44 (2010); *Shear v. City of Wayne Civil Services Commission*, 21 Neb. App. 644, 842 N.W.2d 603 (2014).

Second, there is no dispute that Graham had a property right in her continued employment with the City of Lincoln Police Department and could not have been discharged without good cause. See, Collective Bargaining Agreement, Art. 3, Sec. 2(e); Lincoln Municipal Code § 2.76.445. "Just cause" for dismissal is that which a reasonable employer, acting in good faith, would regard as good and sufficient reason for terminating the services of an employee, as distinguished from an arbitrary whim or caprice. *Ahmann v. Neb. Dep't of Corr. Servs.*, 278 Neb. 29, 767 N.W.2d 104 (2009). See, also, *Stejskal v. Dept. of Admin. Servs.*, 266 Neb. 346, 655 N.W.2d 576 (2003); *Petersen v. Neb. HHS*, 19 Neb. App. 314, 805 N.W.2d 667 (2011). The Nebraska Supreme Court, in the context of police officer discipline, noted that the word "cause" has been defined as "some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position." *Appeal of Levos*, 214 Neb. 507, 516, 335 N.W.2d 262, 268 (1983) (quoting *Coursey v. Board of Fire and Police Commissioners*, 90 Ill.App.2d 31, 234 N.E.2d 339 (1st Dist. 3rd Div.1967)).

BURDEN OF PROOF

Graham asserts that the Board applied an improper "standard of review" in deciding whether the evidence supported the termination of her employment, and that as a result, she was denied due process. Before analyzing this assigned error further, it is apparent that Graham's complaint is not with the "standard of review" applied by the Board, but rather, with its alleged allocation of the burden of proof. The district court concluded that there was no evidence that the Board placed the burden of proof on Graham to demonstrate that her termination was not justified. The court determined that the issue before the Board was whether the City had just cause to terminate Graham's employment.

Graham bases this assignment of error primarily on the Board's use of the term "grievance" when referring to her appeal. Graham argues that because a grievance is initiated by an employee, the employee has the burden of proof in a Board's review of the grievance determination. On the other hand, in an appeal from a decision to terminate an employee's employment, Graham asserts that the employer bears the burden. Graham argues that the Board, by mischaracterizing the nature of the proceeding, failed to consider whether the City reasonably proved Peschong's claims supporting the termination of Graham's employment. Graham further argues that because the "appropriate level of inquiry was abandoned by the Board," there was a due process violation. The district court determined that the reference to the term "grievance" did not cause the Board to apply an improper review or deny Graham due process.

Upon our examination of the record, we find that the procedure actually utilized by the Board, rather than an overly narrow focus on terminology, shows that the Board treated the proceeding as an appeal, the proper burden of proof was utilized, and due process was afforded to Graham. The Nebraska Supreme Court has warned of the risk of over reliance on terminology, finding that an incorrect statement of the burden of proof is not reversible error per se, if a district court's decision in an Administrative Procedure Act appeal otherwise conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Sunrise Country Manor v. Neb. Dept. of Soc. Servs.*, 246 Neb. 726, 523 N.W.2d 499 (1994). While the

- 7 -

context of this case differs from that in the *Sunrise Country Manor* case, we apply a similar focus on the actual procedure used by the Board in our case.

First, with regard to Graham's due process rights, we note that she is only asserting a due process violation in connection with the Board hearing; the posttermination process. Upon our review of the record, it is nevertheless clear that Graham was afforded adequate due process during the entire process. Graham was given written notice of the charges brought against her along with various notices, both oral and written, throughout the investigative process; she was provided an explanation of the employer's evidence; and she was given an opportunity to present her side of the story.

Second, with regard to Graham's argument that the Board applied an incorrect burden of proof, we find that the record clearly refutes this claim. We agree with Graham that the burden of proof was upon the City at the Board hearing to present evidence supporting Graham's termination of employment. See *Waste Connections of Neb. v. City of Lincoln*, 269 Neb. 855, 697 N.W.2d 256 (2005). The record shows that the hearing was in fact conducted in such a manner. The City presented its evidence first, offering numerous exhibits and witness testimony to support its assertion that the termination of Graham's employment was appropriate. The City requested that the Board "uphold" the termination decision. In response, Graham offered exhibits and called witnesses to testify on her behalf, along with testifying herself, in an effort to rebut the evidence presented by the City, show that Graham did not intentionally falsify the MVAR, and support her argument that the termination of her employment was improper.

Finally, the record shows that both the parties and the Board in its administration of the hearing treated the proceeding as an appeal. Counsel for both parties referred to the Board hearing as an appeal. More importantly, the Board administered the hearing as an appeal, placing the burden of proof on the City, and receiving extensive evidence from both parties concerning the termination of Graham's employment.

At the conclusion of the hearing, a member of the Board moved to "deny the grievance." However, another member asked for clarification on the motion, leading the moving member to confirm that the motion was to "deny the grievance *and uphold the City's side*." (Emphasis supplied). Such language is consistent with denying an appeal. This was followed by the unanimous decision of the Board to uphold the termination. This was the only time the term "grievance" was used during the hearing, and it clear from the record that the Board treated the proceeding as an appeal.

In its subsequent written decision, the Board captioned the action as "In the Matter of the Appeal of the Termination of Tracy Graham;" indicated that the matter came before the Board "on the request for an appeal hearing" by Graham; stated that a motion was made "to deny the grievance [appeal]" and "to uphold the City's termination of Graham;" and concluded by ordering that "the Appeal of the termination" is denied.

Lastly, it is worth noting that Graham requested an appeal hearing before the Board pursuant to Article 9, Section 5 of the Lincoln Police Union Collective Bargaining Agreement. This Article is entitled "Grievance Procedure," and Section 5 states that "in the case of a demotion, suspension or *dismissal*, Steps 1-2 of the grievance procedure shall be eliminated and the employee shall present *notice of appeal* to the Personnel Director or his designated representative within

fifteen (15) calendar days from the date of notification of the discipline for scheduling on the Personnel Board agenda." (Emphasis supplied). This supports the notion that the use of the term "grievance" versus "appeal" in the context of this case is a distinction without a difference. Therefore, in addition to the Board having properly treated the action as an appeal, Graham's utilization of the grievance procedure section to appeal the termination decision removes any doubt that the reference to a grievance at the hearing did not in any way affect the process used by the Board to determine the appeal or violate due process requirements.

The district court did not err in finding that the Board applied the proper burden of proof at the hearing and that Graham was afforded appropriate due process. This assignment of error is without merit.

PROPER WEIGHING OF EVIDENCE

Graham next asserts that the district court erred by failing to find that the Board did not properly weigh the evidence presented at the hearing. Graham argues that because the Board failed to properly weigh the evidence, she has been deprived of her due process right to such a review. An examination of the record from the Board hearing demonstrates that the Board had a sufficient opportunity to weigh the evidence before it and did in fact weigh such evidence in reaching its decision.

We agree that the Board had a duty to weigh the evidence presented at the hearing before determining whether to uphold the termination of Graham's employment. Indeed, the Nebraska Supreme Court has held that an agency's judgment must be based on a factual foundation and must give due consideration to all the essential elements involved. *In re Application of Jantzen*, 245 Neb. 81, 511 N.W.2d 504 (1994). Unless there is affirmative evidence to the contrary, a reviewing court will presume that an agency has duly considered all the evidence before it. *Benitez v. Rasmussen*, 261 Neb. 806, 626 N.W.2d 209 (2001).

In her brief, Graham claims that because the Board "simply voted to deny Graham's 'grievance,' without discussing or deliberating the [sic] evidence," the Board "ignored due process and failed to examine whether the City proved Graham was fired for just cause by weighing the evidence." Graham places her emphasis on the arguably abrupt manner in which the Board hearing concluded. As set forth above, immediately upon the conclusion of the hearing, a motion and vote to uphold the termination was made. However, this resolution occurred following a hearing that lasted nearly 8 hours and which generated 339 pages of testimony and receipt of 36 exhibits. The Board members asked questions of the witnesses and were otherwise engaged during the hearing. At the conclusion of this lengthy hearing, the Board members were given the option to either move to vote or move to deliberate. A motion for a vote was made and seconded, and all four members voted to uphold the termination. Although given the opportunity, no member of the Board requested deliberation. Given the unanimous vote, it can be implied that none of the members felt that formal deliberation was necessary. There is nothing in the record to support a conclusion that such lack of formal deliberation prior to the vote indicates that the Board failed to consider the evidence. During the course of the extensive and detailed hearing, the members arguably had sufficient time to individually consider and weigh the evidence prior to determining how to vote.

- 9 -

Graham has not cited to any authority requiring the Board to formally deliberate prior to its decision, and we are not aware of any such authority.

There is no affirmative evidence that the Board failed to consider all the evidence in reaching its decision, or as would otherwise allow this court to go against the deference granted to the Board under our standard of review. This conclusion is supported by the comprehensive written decision of the Board, within which the Board details the evidence it considered in making its decision. The district court did not err in failing to find that the Board did not properly weigh the evidence before making its decision.

Further, Graham's argument that she was denied due process in the failure of the Board to weigh the evidence is also without merit. Graham was afforded due process through a lengthy posttermination hearing, where she was provided a reasonable opportunity to present her side of the story and defend against the accusations brought against her. The Board, as an impartial decision maker, considered the extensive evidence presented by both sides in making its decision. The district court did not err in finding that Graham was afforded appropriate due process by the Board.

Graham's second assignment of error is without merit.

REASONABLENESS OF TERMINATION

Graham asserts that the district court erred in its determination that Peschong acted reasonably and that termination of Graham's employment was not arbitrary or capricious. She bases this assertion in part on Peschong's, and the LPD's, alleged gender bias and Domangue's alleged personal bias against Graham, which in turn purportedly impacted the investigation and her subsequent termination.

In concluding that there was sufficient relevant evidence to support the Board's decision to affirm the termination, the district court thoroughly reviewed and discussed the evidence which supported the findings that Graham intentionally falsified the MVAR, and that Graham's termination was not unlawfully motivated. The court further found that Graham's termination was not arbitrary or capricious, holding that the Board could reasonably conclude that Peschong had just cause "which a reasonable employer, acting in good faith, would regard as good and sufficient reason for terminating Graham's employment." The court further found that the record from the full evidentiary hearing demonstrates that the decision to affirm and uphold the termination "was not guided by fancy or made with disregard of the facts and circumstances." Upon our examination of the record, we agree that the Board's decision was reinforced by sufficient evidence supporting Peschong's termination of Graham's employment as reasonable and done in good faith for just cause, as opposed to being arbitrary and capricious.

In reviewing an administrative agency decision on a petition in error, an appellate court reviews the decision to determine whether the agency acted within its jurisdiction and whether sufficient, relevant evidence supports the decision of the agency. *Kaapa Ethanol v. Board of Supervisors*, 285 Neb. 112, 825 N.W.2d 761 (2013). The evidence is sufficient, as a matter of law, if an administrative tribunal could reasonably find the facts as it did from the testimony and exhibits contained in the record before it. *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012). See, also, *Busch v. Civil Service Commission*, 21 Neb. App. 789, 844 N.W.2d 324

(2014) (court applied this sufficiency of evidence standard in its decision to uphold a civil service commission's affirmation of the termination of a police sergeant). The term "unreasonable" can be applied to an administrative decision only if the evidence presented leaves no room for differences of opinion among reasonable minds. *In re Water Appropriation A-4924*, 267 Neb. 430, 674 N.W.2d 788 (2004).

An administrative agency decision must not be arbitrary or capricious. *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012). Agency action is arbitrary and capricious if it is taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable person to the same conclusion. *Marion's v. Nebraska Dept. of Health & Human Servs.*, 289 Neb. 982, 858 N.W.2d 178 (2015).

Following the investigation conducted by Domangue, Peschong reasonably determined that Graham submitted an intentionally falsified MVAR in an effort to hide the mistakes she made while investigating Wambold's accident. The record shows that the information in the MVAR conflicted with statements Graham made to her supervisors immediately following the Wambold accident. Graham was trained on how to correctly fill out a MVAR and she had access to instructions, suggesting that the incorrect MVAR entries she made were more than mere mistakes. There was also evidence that Graham's explanation regarding her failure to note a "suspicion of alcohol" on the MVAR changed during the Chief's Investigation and that Graham may have timed her completion of the MVAR, a form that takes around 20 minutes to complete, in order to avoid the criticism of those who were aware that alcohol was involved in the incident.

Additionally, Graham's intentional falsification of the report raised serious concerns for Peschong regarding her future credibility. Peschong testified regarding the importance of trustworthiness among police officers, stating that "it's a mandatory requirement that police officers must be honest in the performance of their duties," and that the actions of Graham were such that "her credibility . . . could not withstand that." Peschong's testimony supported the notion that just cause existed for the termination in that Graham's continued employment would be detrimental to the discipline and efficiency of the LPD or would otherwise be harmful to the department and the citizens of Lincoln. The evidence as a whole supported Peschong's conclusion that Graham violated numerous LPD General Orders, along with the Lincoln Municipal Code.

Graham seeks to discredit the testimony and evidence brought against her. While various evidentiary conflicts existed in this case, along with accusations by Graham that her termination was the result of bias, the conclusion reached by the Board was sufficiently supported by the record. In determining whether the Board could reasonably reach the conclusions it did based on the evidence presented, we do not reweigh the evidence or make independent findings of fact. See *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012).

We agree with the district court that there existed sufficient relevant evidence for the Board to find that Graham's termination was based on just cause and done in good faith, and was not arbitrary and capricious. The Board's unanimous decision to uphold the termination was not taken in disregard of the evidence presented at the hearing and was a reasonable result.

Therefore, Graham's third assignment of error is without merit.

LEVEL OF DISCIPLINE

Graham asserts that the district court erred in its failure to find that the termination of Graham's employment was excessive. Graham supports her assertion by arguing that termination was inappropriate based on her lack of past misconduct, that the manner in which she filled out the report was "only a minor mistake," and that her termination was inconsistent with principles of progressive discipline and punishments imposed on officers in comparable situations by the LPD. The district court held that "sufficient, relevant evidence supported the Board's finding that termination was the appropriate level of discipline."

As articulated in LPD General Order 1440, Subsection II(E), the appropriate level of officer discipline is determined on the basis of several factors. These factors include not only "the employee's general past performance and work history," but also the "severity of the violation itself" and "action taken in similar circumstances for the same violation." Furthermore, LPD General Order 1440, Subsection II(D) defines termination as the appropriate level of discipline "when the violation was so grave that continued employment would affect the operational effectiveness of the department."

As previously established, there existed sufficient, relevant evidence to find that Graham's actions concerning the MVAR amounted to a serious violation; primarily due to her intentional falsification of the report. While Graham attempts to minimize her completion of the report as involving "minor mistakes," she ignores the impact her actions, and the intent behind them, have on her continued fitness to be a police officer. The evidence was sufficient to demonstrate that Graham's credibility was damaged through the intentional falsification of the MVAR to the extent that her continued employment would negatively affect the LPD. This was true despite Graham's claimed lack of prior discipline. Therefore, her positive past conduct was outweighed by the severity of her actions and its negative impact on her ability to effectively serve the department.

Graham's termination was not inconsistent with the principles of progressive discipline utilized by the LPD. As mentioned above, LPD General Order 1440, Subsection II(D) specifies that termination is the proper level of discipline when the officer's violation was "so grave that continued employment would affect the operational effectiveness of the department." There is no requirement that the punishment begin at a lower level, such as discipline through "education" or a "warning," when the nature of the offense alone justifies termination.

The record indicates that this level of discipline has been applied consistently to other officers who intentionally falsified police reports or provided false statements during internal investigations. Specifically, Teresa Hruza testified on cross-examination regarding two officers who falsified official police reports (including a MVAR) and two officers who provided false information during an internal investigation. All four of these officers were terminated or resigned in lieu of discipline. When asked by a Board member whether any LPD employees had falsified reports in a manner similar to Graham and avoided termination, Peschong responded by stating that anyone he knew that had falsified official reports had been terminated. Other officers provided similar testimony, giving various examples of officers being terminated or resigning prior to a pretermination hearing as the result of false reporting, lying during internal investigations, or lying during accident investigations. Therefore, it is clear from the record that Graham's termination

properly corresponded with the nature of her infractions. The district court did not err in finding that termination was the appropriate level of discipline.

Graham's final assignment of error is without merit.

CONCLUSION

The district court did not err in affirming the Board's decision to uphold the termination of Graham's employment.

AFFIRMED.