STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, V. BRIAN L. JOHNSON, RESPONDENT.

590 N.W. 2d 849

Filed March 19, 1999.    No. S-98-465.

John W. Steele, Assistant Counsel for Discipline, for relator.

Brian L. Johnson, pro se.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.

This is an attorney disciplinary case in which the Nebraska State Bar Association (NSBA), relator, seeks to discipline Brian L. Johnson, respondent.

On May 15, 1998, the Committee on Inquiry of the Third Disciplinary District filed formal charges against respondent. The committee alleged that while representing defendants in a criminal proceeding in 1997, respondent violated Canon 1, DR 1-102(A)(1) and (5), Canon 2, DR 2-110(A)(1) through (3), and Canon 6, DR 6-101(A)(3), of the Code of Professional Responsibility. Pursuant to Neb. Ct. R. of Discipline 10(F), the NSBA filed additional charges alleging that while representing Darrin Hofmann in a specific performance case in 1997, respondent violated the same provisions of the Code of Professional Responsibility as stated above. The relevant provisions of the Code of Professional Responsibility are as follows:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(5) Engage in conduct that is prejudicial to the administration of justice. . . .

. . . .

DR 2-110 Withdrawal from Employment.

(A) In general.

(1) If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from employment in a proceeding before that tribunal without its permission.

(2) In any event, a lawyer shall not withdraw from employment until the lawyer has taken reasonable steps to avoid foreseeable prejudice to the rights of his or her client, including giving due notice to the client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules.

(3) A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned.

. . . .

DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

. . . .

(3) Neglect a legal matter entrusted to him or her.

In his answer to the charges, respondent filed a counterclaim against the NSBA, seeking money damages. This court has stricken the counterclaim.

This court referred the matter to a referee, pursuant to Neb. Ct. R. of Discipline 10(J) (rev. 1996). The referee conducted a formal evidentiary hearing on August 27, 1998, which respondent did not attend. Respondent had informed the referee that he would not attend the hearing before the referee unless he was given an assurance that he would not be questioned.

The referee found that the evidence clearly and conclusively established that respondent violated his oath and violated all six disciplinary rules stated above both in his representation of the defendants in the criminal proceeding and in his representation of Hofmann. In addition to these determinations, the referee noted a concern with respondent's attitude throughout the disciplinary proceeding, finding that he "remains generally unrepentant and . . . tends to point the blame at everyone but himself, and his general decorum and responsiveness to the entire situation reflects poorly on his past and future ability to practice law." The referee recommended that respondent be suspended from the practice of law for 2 years and that he should not be readmitted without completing a course on ethics.

In his response to the referee's report, respondent took no exception to the referee's factual findings or the referee's determinations that respondent violated certain disciplinary rules. Regarding the recommended suspension, respondent agreed that he should be suspended and added that he should also be publicly censured, but asserted that the suspension should be variable and should end upon his completion of a 100-page dissertation regarding ethics, with the specific subject to be determined by this court. However, in his brief to this court, respondent (1) asserts that the referee did not consider certain mitigating evidence; (2) provides justifications for his actions; and (3) argues that in his representation of Hofmann, respon-

dent did not violate any disciplinary rule. The NSBA took no exception to the referee's report.

## STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Malcom,* 252 Neb. 263, 561 N.W.2d 237 (1997); *State ex rel. NSBA v. Johnston,* 251 Neb. 468, 558 N.W.2d 53 (1997). The charges against an attorney must be established by clear and convincing evidence. See *State ex rel. NSBA v. Johnston, supra.*

## FACTS

Because respondent did not attend the hearing before the referee and did not take exception to the referee's determinations other than the recommended discipline, we do not address his arguments in his brief that contest the referee's findings. See *State ex rel. NSBA v. Schmeling,* 247 Neb. 735, 529 N.W.2d 799 (1995). We nonetheless conduct a de novo review of the record, and upon our review, we find the following facts:

Respondent was admitted to the practice of law in the State of Nebraska on September 28, 1995. At all times relevant to this matter, respondent was engaged in the private practice of law in Madison County, Nebraska.

Respondent was retained by five individuals to represent them on minor in possession charges. They each paid him a fee in advance. Respondent appeared with his clients at their arraignments. He filed a motion to suppress evidence on behalf of each client. The hearing on the motion to suppress was scheduled for June 30, 1997. The clients appeared, but respondent did not. The clients waited at the courthouse and repeatedly tried to contact him. Eric Ford, one of the clients, testified that they reached respondent's secretary but that the secretary did not know where respondent was. Respondent did not con-

tact the court or any of his clients to explain his absence. The county court continued the hearing until July 7.

On July 3 and 7, 1997, respondent filed motions to withdraw as attorney of record for the defendants, but did not attach an affidavit stating that he informed his clients of the motions to withdraw. In fact, he did not notify any of the five clients that he was withdrawing. The motions stated that he did not attend the suppression hearing because a power failure caused his clocks to fail. Respondent explained that he could no longer represent the clients because of the sale of his office building and because of conflicts with scheduled hearings. He did not appear at the hearing on July 7, although he was still attorney of record. Some of the clients unsuccessfully asserted the motion to suppress pro se, and all of the clients eventually pled guilty. When asked by one client for his money back, respondent wrote to the client stating,

> A flat fee is non-refundable. . . . A hearing on the suppression issue would have cost you considerably more . . . .
>
> I was forced to withdraw from this case through no fault of my own. The Madison County Court Judge would not let me change my local court cases to another date, and they always conflicted with your cases in Bassett.
>
> If you have a complaint, then direct it to this judge who usurps the power of a lawyer to even request a continuance without his prior permission. I cannot help it if there are judges that will not work with attorneys and do not give them proper respect and consideration. In my opinion, this is what caused the conflict in your cases in Bassett, Nebraska. I cannot waste my time arguing with judges over scheduling matters. I have exhausted my patience with them, and with clients like you who never think they are guilty.

Ford testified that he and the other clients understood that the fee they paid would include representation up to but not including a trial. Ford's account of the fee arrangement was contradicted only by unsworn assertions in respondent's answer to the charges. The referee determined that respondent returned the fees in full, but only after the Committee on Inquiry conducted its hearing.

In the second legal matter at issue, respondent represented Hofmann in a specific performance case against Garry Pollman, Jr., in Madison County District Court. Respondent filed a petition on behalf of Hofmann. Attorney Jan Einspahr represented Pollman and filed a counterclaim in the suit. Respondent filed an answer to the counterclaim on behalf of Hofmann on May 15, 1997. A pretrial conference was scheduled for September 29.

On June 6, 1997, Einspahr sent respondent a letter indicating that their two respective clients were working out a settlement without the assistance of counsel. The letter requested respondent advise her if Hofmann had told respondent of the settlement and stated that if so, they could arrange the closing on the real estate at issue. Respondent made at least one attempt to contact Hofmann by regular mail prior to the pretrial conference date. The record indicates that Hofmann did not receive the message because he had moved out of town and did not provide respondent with a forwarding address.

In a letter dated July 25, 1997, respondent wrote Einspahr and expressly noted the scheduled pretrial conference. He stated in the letter that he had little contact with Hofmann and asked Einspahr if he needed to dismiss the case. This letter was the last communication Einspahr received from respondent prior to the pretrial conference. Einspahr testified that she called respondent daily for 2 weeks but could not reach him.

Respondent failed to appear at the pretrial conference on September 29, 1997, and did not contact the court to explain his absence. The court attempted to contact respondent at the time of the pretrial conference but reached an answering machine. The court dismissed Hofmann's petition. Respondent wrote to Hofmann in a letter dated September 30, using the last address he had for Hofmann, that the court had dismissed Hofmann's claim and that the counterclaim still existed but that respondent had not agreed to, and would not, represent Hofmann on Pollman's counterclaim.

Trial was held on Pollman's counterclaim, and on December 4, 1997, a judgment of $5,287.91 was entered against Hofmann. Respondent did not appear at the trial on the counterclaim and did not contact the court or Einspahr to explain his absence. At

no time did he request the court to permit him to withdraw as Hofmann's counsel.

Einspahr mailed the judgment against Hofmann to respondent, as attorney of record. Respondent objected, stating that he was not Hofmann's attorney and claiming that he had made no appearance on the counterclaim. Respondent asked the district court clerk to mail the judgment documents directly to Hofmann.

Hofmann later obtained other counsel and attempted to vacate the judgment against him, but was unsuccessful.

## ANALYSIS

### DISCIPLINARY RULE VIOLATIONS

After reviewing the record of the proceedings de novo, we find that the evidence clearly and convincingly shows that respondent violated DR 1-102(A)(1) and (5), DR 2-110(A)(1) through (3), and DR 6-101(A)(3) in his representation of the defendants in the criminal proceeding, in that he neglected a legal matter entrusted to him, engaged in conduct that is prejudicial to the administration of justice, withdrew from representation without permission from the court and without giving notice to his clients, and refused to promptly refund unearned fees. As to respondent's representation of Hofmann, we find the evidence clearly and convincingly shows that respondent violated DR 1-102(A)(1) and (5), DR 2-110(A)(1) and (2), and DR 6-101(A)(3), in that he neglected a legal matter entrusted to him, engaged in conduct that is prejudicial to the administration of justice, and withdrew from representation without permission from the court and without taking reasonable steps to avoid foreseeable prejudice to his client's rights. However, we find that the evidence does not clearly and convincingly support the referee's determination that respondent violated DR 2-110(A)(3) during his representation of Hofmann. The evidence indicates that respondent might not have received a fee from Hofmann beyond that necessary to pay costs of filing the petition. Thus, we dismiss the NSBA's charge that respondent violated DR 2-110(A)(3) in the course of his representation of Hofmann.

## IMPOSITION OF PENALTY

We now address the appropriate disciplinary measures to be taken. To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, this court considers the following facts: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the offender generally, and (6) the offender's present or future fitness to continue in the practice of law. *State ex rel. NSBA v. Schleich,* 254 Neb. 872, 580 N.W.2d 108 (1998); *State ex rel. NSBA v. Scott,* 252 Neb. 698, 564 N.W.2d 588 (1997). Each case justifying discipline of an attorney must be evaluated individually in light of the particular facts and circumstances of that case. *State ex rel. NSBA v. Schleich, supra.* For purposes of determining the proper discipline, we consider respondent's acts both underlying the events of this case and throughout this proceeding. See *State ex rel. NSBA v. Schmeling,* 247 Neb. 735, 529 N.W.2d 799 (1995); *State ex rel. NSBA v. Zakrzewski,* 252 Neb. 40, 560 N.W.2d 150 (1997). Cumulative acts of attorney misconduct are distinguishable from isolated incidents of neglect and therefore justify more serious sanctions. *State ex rel. NSBA v. Johnston,* 251 Neb. 468, 558 N.W.2d 53 (1997); *State ex rel. NSBA v. Schmeling, supra.*

We note that our analysis is limited to the record of the referee's hearing. Respondent did not attend the hearing, nor was he represented by counsel. To the extent that his brief provides explanations for his actions that are not supported within the record, those arguments will not be considered. Additionally, respondent complains in his brief that the referee did not consider a packet of documents that respondent had mailed to this court and requests us to do so. Because respondent did not offer these documents into evidence at the hearing, we, like the referee, will not consider them.

In both matters at issue, respondent neglected his duty to represent his clients by failing to make court appearances. Standing alone, these errors constituted a breach of Johnson's professional responsibility which would warrant some degree of discipline. However, respondent's subsequent acts and omis-

sions exacerbated his original misconduct and thus increased the seriousness of his disciplinary infraction.

As to the defendants in the criminal proceedings, respondent failed to call either the clients or the court to explain his absence and failed to notify the clients that he was withdrawing. Although the referee determined that respondent's actions were not the causal factor in his clients' being convicted, he nonetheless left the clients to fend for themselves at a criminal proceeding. Worse, when a client demanded a refund of the fee he paid (where the evidence clearly shows that the fee paid for at least his presence at the motion to suppress hearing), respondent not only refused to refund the fee, but proceeded to attack his client's character and chastise a judge. Thus, he wrongly retained an unearned monetary benefit at the expense of his client. Such conduct not only needs to be deterred to protect the public but also because it negatively reflects on the reputation of the entire bar.

As to the Hofmann matter, respondent neither asked the court for permission to withdraw from the case nor contacted the court to explain his absence either at the pretrial conference or at the trial on the counterclaim. He did not inform opposing counsel of his view that he was not Hofmann's attorney on the counterclaim. In summary, respondent unilaterally decided at some point that he would no longer represent Hofmann. The decision to withdraw as counsel was not solely within respondent's discretion. See DR 2-110(A). Hofmann lost the opportunity to assert his claim and had a judgment rendered against him without the benefit of legal representation. As the referee determined, respondent's conduct had a direct effect on Hofmann's civil case. This conduct reflects negatively on the reputation of the bar and should also be deterred.

Numerous facts within the record call into question respondent's present fitness to practice law. Respondent filed an affidavit in this proceeding (filed July 22, 1998) on which he signed as both the affiant and the notary. He asserts in this *civil* proceeding that he had the right to remain silent and to refuse to testify. Respondent asserts that he has no continuing responsibility to a client whom he has determined to be guilty. He

asserts, apparently misunderstanding the authority of a court order, that he did not "feel compelled to attend [the] pretrial conference, as these are mere courtesy and not even mentioned under Nebraska law . . . ." He asserts in this proceeding that he had no duty to represent a client on a counterclaim when he had entered an appearance on the counterclaim.

Yet another example indicating a lack of present fitness to practice law is respondent's objection in this proceeding to the fact that another attorney, rather than Hofmann, filed the complaint to the NSBA, asserting that it is improper for an attorney to report another attorney's conduct. Respondent fails to understand that attorneys have a *duty* to report unprivileged knowledge of another attorney's violation of the Code of Professional Responsibility—a duty that can result in disciplinary action if violated. Canon 1, DR 1-103(B), of the Code of Professional Responsibility. To conclude that respondent is simply ignorant of this rule would be lamentable enough, except that he has expressly referred to the corollary Ethical Consideration 1-4 as the "Nazi rule."

Although an attorney has the right to defend himself or herself zealously in a disciplinary proceeding, respondent's extremely negative attitude and inflammatory and derogatory remarks toward the NSBA and the disciplinary process also weigh in favor of a harsher punishment. Early in the investigation, he threatened the Counsel for Discipline, stating:

> You may expect a federal case in this issue before the expiration of the statute of limitations. Do not think for a moment that I will confine these issues to this state as there are much broader questions here, including a *pattern of harassment and discrimination* by your office, and your personal deniability and unaccountability. This is a Federal issue that goes directly to my ability to earn a fair living and to be free from the abuses and interference of government and meddling organizations like the NSBA, and addresses your seeming immunity to act without regard to the consequences, reason or the truth. . . .
>
> . . . .
>
> My second cause of action against your office is a distinct form of invidious discrimination, and your discrimi-

natory treatment of me because of the fact that I am a descendant of the Germans from Russia, a group that is *clearly* a minority in this country. [Y]our pattern of personal harassment against me, cover-ups of unethical conduct by others you work with, and your flagrant abuse of authority is clear!

(Emphasis in original.) In his answers to the formal charges, respondent asserted a counterclaim against the NSBA for monetary damages and stated that the Counsel for Discipline "abused his authority in a way that smacks of fascism." Respondent accused the judge in the Hofmann matter of malice and corruption. He asserts in his brief that Hofmann's own negligence caused the counterclaim judgment.

We have stated, "The repeated derogatory and inflammatory statements made by respondent . . . cannot be ignored and will not be tolerated. Because such tactics reflect respondent's overall fault-finding attitude in this matter, we take them into consideration in determining an appropriate penalty." *State ex rel. NSBA v. Zakrzewski*, 252 Neb. 40, 51, 560 N.W.2d 150, 157 (1997).

The determination of an appropriate penalty to be imposed on an attorney also requires consideration of any mitigating factors. *State ex rel. NSBA v. Schleich*, 254 Neb. 872, 580 N.W.2d 108 (1998). In the instant case, the violations were not criminal in nature, and as to the Hofmann matter, respondent did not monetarily benefit from his wrongdoing. Respondent did have difficulty contacting Hofmann to determine whether in fact the client was settling the matter without counsel. As to the defendants in the criminal proceeding, respondent admitted in the investigation that he failed to withdraw properly and that he should have told his clients he was withdrawing. We also note that at the time these violations occurred, respondent had been in practice for approximately only 2 years.

In conclusion, respondent demonstrates a current lack of character, attitude, and knowledge of his ethical duties required to continue in the practice of law. Thus, we hereby suspend respondent from the practice of law for a period of 4 years, effective immediately. Additionally, we condition his readmission to the practice upon a showing that his acts over the course

of the 4-year suspension demonstrated the level of character and fitness enumerated in Neb. Ct. R. for Adm. of Attys. 3(a) through (d) and (j) (rev. 1998).

JUDGMENT OF SUSPENSION.

MILLER-LERMAN, J., not participating.

GERRARD, J., concurring in part, and in part dissenting.

I concur in the majority's findings regarding respondent's conduct and the imposition upon respondent of a 4-year suspension from the practice of law with the conditions for readmission stated therein. In addition, however, I would order respondent to submit to a psychiatric evaluation and further condition his reinstatement to the bar upon satisfactory compliance with all reasonable recommendations of that evaluation.

### FACTUAL RECORD

The majority opinion persuasively sets forth several instances that not only demonstrate respondent's unfitness for the practice of law, but also seem to evidence an apparent mental instability in respondent. For example, in a letter to the referee dated July 24, 1998, respondent indicated that he would not participate in the disciplinary hearing before the referee. Respondent stated:

> I have come to the conclusion that perhaps they only intend to trap me somehow by twisting my words if I take the stand, since their evidence is scanty, at best. I think they may be desperate at this point to get me on the stand so they might twist the truth.

> Furthermore, they also might try to use their influence to cause further legal difficulties for me. I am not naive enough to think that the NSBA exists in a vacuum in Lincoln. I know full well the depths of this organization as I was once part of the legal community when I lived there several years ago.

> My reasons for this should be obvious. I have certain political and personal enemies at the Bar Association who have pursued me ever since I walked out the doors of law school, who already started to attack my character at that point. These enemies cannot prove, and in the past three

years have failed to prove anything against me, though I know they would like to. I do not know why, though I have my suspicions. I will not state those suspicions at this time, and will not name the individuals I believe are responsible. . . .

. . . .

Be advised that I will not appear in Lincoln for this hearing if I am expected to take the stand against myself. I will adamantly oppose any requests or attempts to place my life in jeopardy at the hands of false accusers.

The line of thought expressed in respondent's letter to the referee was also manifested in his reply to the formal charges filed against him. In response to the formal charges, respondent alleged that the Counsel for Discipline "has abused his authority in a way that smacks of fascism" and that he was "hiding behind his cloak of immunity as if he is somehow above the law and can never be sued for this reckless conduct in attempting to destroy my life." In asserting his "counterclaim," respondent speculated, "I believe this may have something to do with my latest divorce and the fact that . . . my ex-wife, who has been married three times, is personal friends with several members of the NSBA . . . ."

Respondent later reaffirmed his counterclaim, stating:

Respondent requests an injunction against the NSBA and that they be Ordered to *Cease and Desist* from contacting Respondent in any manner. Respondent requests that any immunity for these parties be lifted so that private civil suit can be brought against them for damage to Respondent's business in the amount of $2000.00 per month since October 1997 when the first investigation was started, and for other emotional distress experienced by Respondent because he cannot sleep at night and has experienced severe physical symptoms as a result of being served by the sheriff for charges from the NSBA relating to innocent acts. Respondent has developed an ulcer as a result of this harassment, and considers the actions of [the Counsel for Discipline's office] extreme and *OUTRAGEOUS*, because they have evidence in their possession that would tend to exonerate Respondent, but that they

choose to ignore it. Respondent asks that [the Counsel for Discipline] be removed from his position at the NSBA and made to answer for his outrageous conduct and reverse discrimination. Respondent feels that if he had been a recognized minority, like a black, Hispanic or Asian, this would have been dismissed at the outset.

(Emphasis in original.)

Respondent also sent several letters directly to the Counsel for Discipline. In a letter dated April 15, 1998, respondent stated, "As attorneys, we trust that your office will at least investigate matters that come before it, even though we know there are myriad interpretations and even many more instances of abuse and unethical conduct that teems like maggots in this society." In the same letter, respondent also attempted to explain his failure to contact or respond to contacts from Einspahr, stating:

The reason I did not discuss these matters with Jan over the phone is because of my negative experiences with women, and especially her, in the past when I talked to her on the phone. . . . I would not discuss anything with Jan Einspahr because in my opinion, her belligerent, deceptive nature and her inability and unwillingness to compromise, w[ere] dangerous to my personal and professional position. I was equally, if not more, unwilling to speak with her about the matter until the day of trial and I tend to be quite assertive myself (not aggressive) (I'm a lawyer after all!).

. . . [T]he last thing I needed, or ever need again, is to be accused falsely by a woman (or anyone). Her excuse to the judge was that I didn't answer the phone. I see no requirement for this anywhere, as *this is what a court of law is for*, and that is why I filed a petition IN COURT and not a request for a phone discussion! Important matters should NEVER be discussed over the phone. Nothing is ever, or rarely, resolved that way. (I have since sent Jan Einspahr a letter stating my new office policy that I will not speak with her on the phone or take her calls EVER again. Every conversation with her is counterproductive, as all she ever wants to do is argue and twist the truth. . . .

I have been married twice before, and this seems to be counterproductive, to say the least.[)]
(Emphasis in original.)

Respondent, in the same letter, explained his failure to appear at the pretrial conference in the Hofmann matter, stating, "I did not attend the pretrial conference, nor would I fall into any unsuspecting trap that was not recorded by a certified court reporter. THIS IS MY RIGHT to be heard AT TRIAL, and not to have to waste my time on unproductive pretrial conferences!!"

Later in the same letter, respondent wrote:

> I am tired of the liars and losers getting protection when it is so undeserved. I have spent my life trying to prove that I do not have to be poor, only to regrettably find myself in a messed up society where all one has to do is claim to be a victim, or prove that they are poor, and the rest of us are supposed to cater to them and pay their way in life. The truth has a way of surfacing. This is the TRUTH . . . . Do what you wish with it. I have lived my life by it, and am sick and tired of pulling others around. I only hope that this stops somewhere and we stop protecting those who don't deserve so much as the time of day! . . .
>
> . . . .
> . . . I will take this to a higher court and do whatever I have to do, and name whomever I wish so that this all comes to a halt, if I do not get the result I not only deserve, but that I expect, even if I lose every step of the way, because . . . that is just par for the course for me.
>
> I have lost because it is the victims and the sad-sacks that get their way and win, who are so undeserving of anything, yet receive all they ask for. The government and other organizations are so generous with MY time and MY tax dollars that I would be a fool to continue in this profession when I am double taxed and tread upon. I always find myself writing discourses on why the truth should prevail. I guess I must devote all my attention to this foolishness. I might be angry at those who fail to do the right thing, but I cannot bring myself to it, as I have learned that most people don't have a clue as to what is right or wrong anymore! It is like being angry at a child who has not yet

developed the ability to reason. How could I possibly be angry at a child?

In other correspondence addressed to the Counsel for Discipline, respondent attempted to make a complaint about the attorney who had complained about respondent's conduct in the Hofmann case. Respondent speculated that the complainant "has something to gain by removing me from practice in Norfolk as he is in direct competition for my business and he has alot [sic] more overhead than I do." Respondent also speculated that the complainant might not be "aware that I have appealed a decision . . . to the Intermediate Court of Appeals and the BIG NAMES of this town do not like me because I actually might win." After the Counsel for Discipline evidently informed respondent that his countercomplaint had no merit, respondent wrote:

> If this is not resolved to my satisfaction, then I may press a civil lawsuit against any and all of you who are involved. If you think you are immune from such a suit, think again. The US Supreme Court case of *Jones v. Clinton* makes it quite clear that immunity from civil suit while serving in any position of authority is an illusion. A complaint against your office, as well as a possible lawsuit against YOU will follow if I don't get a reasonable answer BASED ON NEBRASKA LAW AND ETHICAL CONSIDERATIONS- NOT YOUR OPINION.

Finally, respondent advanced his theory about discrimination based on his status as a descendent of "Germans from Russia," as noted in the majority opinion. Respondent concluded that discussion by writing:

> I will make a list of the injustices heaped upon the Germans from Russia by this government, including your treatment of me! . . . You have gone too far in your discrimination against me by exhibiting clear favoritism to . . . members of the majority class without giving my complaints and requests equal attention, brushing them aside without proper explanation or proper investigation. A new minority class has emerged and I demand recognition, attention and equal protection under the law!!

Respondent's filings in this court also reflect upon his mental fitness to practice law. In his findings, the referee stated that respondent "remains generally unrepentant." In his brief, respondent stated that "[r]epentance appears to be more in keeping with religious sentiments that have no place in a Court of law." Respondent continued to argue in his brief:

> Thus, for Attorney to *repent* indicates an improper impingement of religious ideas upon the state's responsibility to decide cases without religious interference. . . . That repentance seems to be more of an Inquisitional idea that has no bearing on fact finding and truth and will not help to resolve these complex issues is obvious.
>
> Even if a formal repentence [sic] were made, this case would remain controversial, and a decision would still need to be made by this Court. . . . If this court finds wrongdoing and orders repentence [sic], Attorney is prepared to do so. Until that time, that Attorney should have earlier begged the forgiveness of anyone is absurd. It has never been Attorney's attitude that he should grovel on his knees begging the forgiveness of others when they question his motives and principles, else he might have lived his entire life on his knees begging repentance.

Taken as a whole, respondent's behavior reveals a current incapacity to practice law by reason of a probable mental illness or disability. Many of respondent's written submissions demonstrate significant irrationality, and his tone shifts during the course of a single letter from defiance and hostility to outright despair. However, because nobody has specifically complained of respondent's mental status and respondent has not raised a mental illness defense in his pro se pleadings, we are left with a record devoid of competent medical evidence that would assist us in the ultimate determination of reinstatement in this cause. Nonetheless, based on the record before us, we have the power and obligation to order a psychiatric evaluation as a condition of reinstatement. For the reasons that follow, I conclude that it would be appropriate to order such a psychiatric evaluation in this case.

## APPROPRIATE REMEDY

Neb. Ct. R. of Discipline 11(A) (rev. 1996) provides, in relevant part:

> Upon a complaint that a member is incapacitated from continuing the practice of law by reason of physical or mental illness, or because of addiction to drugs or intoxicants, the appropriate Committee on Inquiry, with the assistance of the Counsel for Discipline, may prepare, verify and submit to the Court an application for the temporary suspension of the member from the practice of law.

It is further provided in Neb. Ct. R. of Discipline 11(C):

> The Court shall take or direct, consistent with fundamental fairness and due process, such action as it deems necessary and proper to determine whether the member is incapacitated from continuing the practice of law, including a direction for an examination of the member by such qualified medical experts as the Court shall designate at the cost of the Respondent.

While neither the Committee on Inquiry nor the Counsel for Discipline requested a stay of the disciplinary proceedings in order to proceed under rule 11, see *Newton v. State Bar of California*, 33 Cal. 3d 480, 658 P.2d 735, 189 Cal. Rptr. 372, (1983) (disciplinary proceedings stayed in order to proceed under rule relating to mental illness), the rules of discipline relevant to this proceeding allow us to provide a remedy that will shed light on respondent's future fitness to practice law and protect the public in doing so. Neb. Ct. R. of Discipline 10(N) (rev. 1996) provides that after hearing, "The Court may disbar, suspend, censure or reprimand the Respondent, place him or her on probation, *or take such other action as shall by the Court be deemed appropriate.*" (Emphasis supplied.) The record before us supports the propriety of ordering a mental health evaluation as a condition of reinstatement.

The Supreme Court of Colorado faced a similar situation in *People v. Fagan*, 745 P.2d 249 (Colo. 1987) (en banc). In that case, the grievance committee recommended that the respondent undergo a psychiatric evaluation as a condition of reinstatement to practice, even though the initial complaints against

the respondent were based on accusations of neglect and not mental illness. The court stated:

> This recommendation is based on the respondent's erratic behavior which we find was manifested, in part, by his conduct of the cases leading to the disciplinary action and, in part, by his conduct during the disciplinary proceedings. The hearing board observed that, at times, [respondent] performed normally and effectively but, at other times, he functioned without noticeable expression or affect and was rambling and disorganized. There also is evidence in the record that the respondent exhibited threatening conduct toward the deputy disciplinary prosecutor.

*Id.* at 253.

The court noted that proceedings in that case had not been initiated under the terms of the Colorado disciplinary rule that explicitly dealt with attorneys suffering from mental illness. *Id.* Nonetheless, the Colorado court found that it could order a mental evaluation as part of its disposition of the case. *Id.*

The court noted that an attorney suspended for more than 1 year was required, as part of a reinstatement proceeding, to demonstrate that the attorney met all the requirements set forth for initial admission to the Colorado bar, including a demonstration that the applicant is " 'mentally stable.' " *Id.* at 254. The court thus determined that the appropriate penalty in that case was a suspension of 1 year 1 day and that prior to reinstatement, the respondent was required to undergo a psychiatric evaluation in order to demonstrate his mental stability. *Id.* See, also, *In the Matter of Wallace W. Rogers, Jr.*, 263 Ga. 314, 431 S.E.2d 366 (1993); *Attorney Griev. Com'n v. Draper*, 307 Md. 435, 514 A.2d 1212 (1986); *In re M.*, 59 N.J. 304, 282 A.2d 37 (1971); *In re Richard F. Crist*, 258 Or. 88, 481 P.2d 74 (1971) (en banc).

Similarly, this court has held that an applicant for reinstatement to the bar must otherwise be eligible for admission to the bar as in an original application for admission. See *State ex rel. Sorensen v. Goldman*, 182 Neb. 126, 153 N.W.2d 451 (1967). The Nebraska rules relating to the admission of attorneys provide that an applicant must have the ability to conduct oneself reliably, communicate clearly, reason and analyze information, comply with deadlines, and conduct oneself professionally and

in a manner that engenders respect for the law and the profession. See Neb. Ct. R. for Adm. of Attys. 3 (rev. 1996). It is specifically provided that further inquiry is required where there is evidence of mental or emotional instability. Neb. Ct. R. for Adm. of Attys. appendix A (rev. 1996).

Taken together, these requirements appropriately empower us to order a respondent to submit to a psychiatric evaluation as a condition of reinstatement to the bar. In order to meet the requirements for reinstatement, a respondent at that time must demonstrate his or her mental fitness for the practice of law, and we would be precluded, as in this case, from properly evaluating a respondent's mental condition without competent psychiatric evidence on the subject. Compare *State ex rel. NSBA v. Barnett*, 243 Neb. 667, 501 N.W.2d 716 (1993) (respondent placed on conditional probation based on recommendation of psychiatric report).

We have set forth similar conditions in disciplinary cases where respondents suffered from substance abuse. In *State ex rel. NSBA v. Miller*, 225 Neb. 261, 404 N.W.2d 40 (1987), we suspended the respondent for 2 years, and conditioned his reinstatement after suspension on his participation in Alcoholics Anonymous; his abstention from alcohol and drugs; and his completion of courses in legal ethics, accounting, and office management procedures. Similarly, in *State ex rel. Nebraska State Bar Assn. v. Erickson*, 204 Neb. 692, 285 N.W.2d 105 (1979), this court suspended the respondent for 1 year and conditioned his reinstatement in part on an affirmative showing that he had controlled his problem of alcoholism. I see no reason to distinguish the case of an attorney that is likely suffering from a mental illness or disability from our established precedent regarding attorneys afflicted by substance abuse.

## CONCLUSION

Therefore, while I concur in the imposition upon respondent of a 4-year suspension from the practice of law, I would, in addition to the conditions already imposed for readmission, also order respondent to submit to a psychiatric evaluation. Based upon the results of the psychiatric evaluation, this court should condition respondent's reinstatement upon satisfactory compli-

ance with all reasonable recommendations in the evaluation, such that respondent demonstrates the level of character and fitness to practice law enumerated in Neb. Ct. R. for Adm. of Attys. 3(a) through (d) and (j) (rev. 1998).

HENDRY, C.J., joins in this concurrence and dissent.