STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR
ASSOCIATION, RELATOR, V. JAMES P. MILLER, RESPONDENT.

602 N.W. 2d 486

Filed November 19, 1999.   No. S-98-769.

John J. Reefe, Jr., for respondent.

Kent L. Frobish, Assistant Counsel for Discipline, for relator.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.

This is an attorney discipline case in which the Nebraska State Bar Association (NSBA), relator, seeks to discipline James P. Miller, respondent.

This disciplinary case arises from Miller's representation of Sharon Best (Sharon) and her son, Brian Best (Brian), who is now deceased. A brief factual background is set forth to give context to the charges filed against Miller. Since birth, Brian had been plagued by significant heart and kidney problems. Because of his poor health, Sharon had maintained a health insurance policy on Brian through Blue Cross Blue Shield of Nebraska. When Sharon was employed by U S West in 1993, she insured Brian under her group health insurance policy, MetLife, as a handicapped dependent. Sharon maintained both policies on Brian so that if she lost her U S West job, Brian would still be covered by Blue Cross Blue Shield. The two policies did not coordinate benefits.

In April 1994, Brian's health deteriorated and he was admitted to the University of Michigan Medical Center at Ann Arbor, Michigan (Hospital), and was treated there for over a month. The total hospital bill was $242,740.26. Both insurers paid the bill in full, with MetLife paying $242,737.76 on July 22, 1994, and Blue Cross Blue Shield paying $242,422.76 on September 26.

For 10 months, Sharon sought a refund of the excess payment, but was unsuccessful. She contacted the Nebraska Department of Insurance, which recommended that she hire an attorney to write a demand letter. Sharon hired Miller, who had previously employed her and represented her, to obtain the overpayment. Sharon and Miller met for a consultation on or about July 3, 1995. There is a factual dispute about the fee arrangement. Sharon claims that Miller orally agreed at the July 3 meeting to charge a 20-percent contingent fee. Thereafter, Brian went to Miller's office on July 14, at which time Brian was asked to sign an assignment of proceeds, which he did. Brian was also presented with an "Attorney Fee Contract" (written agreement) by Miller. When Brian questioned the percentage

fees in the written agreement (one-third if settlement is reached before filing suit and 40 percent after suit is filed), Miller stated that it was just a formality and that Miller had an oral agreement with Sharon to charge a 20-percent contingent fee. Based upon that assurance by Miller, Brian signed the written agreement; Brian was not given a copy of the written agreement. Miller denies any separate fee discussion with Brian, and Miller claims that the written agreement that Brian signed on July 14 is the true agreement: one-third if settlement is reached before filing suit and 40 percent after suit is filed.

Between July 5 and 18, 1995, Miller made telephone calls to Ann Arbor to talk to the Hospital's attorney, Leslie Kamil. Miller testified that he performed some research and had informal discussions with other attorneys about the issues in the case. Miller also drafted an assignment of proceeds and a complaint for filing in federal court. Miller estimated the total time he spent on the Best matter was 50 hours.

On July 19, 1995, at about 2:30 p.m., Kamil, the Hospital's attorney, contacted Miller's partner, Ernest Addison, and told Addison that the Hospital was trying to correct the overpayment situation and had agreed with Julie Nurre at MetLife that MetLife would pay Sharon the money. Notwithstanding this information, at 4:04 p.m. on the same day, Miller filed suit against the Hospital in the U.S. District Court for the District of Nebraska. Miller explained that he filed suit that day because he thought the money could be obtained more quickly from the Hospital, rather than having the money returned to MetLife and then passed on to Sharon. In a letter sent by Miller to Sharon dated July 19, Miller enclosed the complaint but failed to mention Addison's conversation with Kamil.

On August 1, 1995, Kamil called Addison and agreed to send the federal district court a check for $242,737.76. A settlement agreement was reached, and interest was never discussed. Brian later went to Miller's office to sign the settlement agreement, but refused to do so when Brian saw that Miller was claiming 40 percent of the recovery. On September 27, Miller sent Sharon a check for $145,642.66, which is the total recovery less Miller's 40-percent fee. Sharon then hired attorney Melvin Hansen to represent her in connection with this fee issue. Hansen advised

Sharon to negotiate the check because although the check to Sharon in fact was written on Miller's trust account, the check itself did not indicate its source. Sharon negotiated the check on October 26. On November 7, Miller withdrew $96,000 in attorney fees from his trust account.

On November 27, 1995, Sharon lodged a complaint against Miller with the NSBA Counsel for Discipline, and the Disciplinary Review Board of the NSBA subsequently filed formal charges against Miller. The Disciplinary Review Board charged that while representing Sharon and Brian, Miller violated his oath of office as an attorney and Canon 1, DR 1-102(A)(1) and (4); Canon 2, DR 2-106(A) and (B); and Canon 9, DR 9-102(A)(2), of the Code of Professional Responsibility. The relevant provisions of the code are as follows:

DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

. . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

. . . .

DR 2-106 Fees for Legal Services.

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

. . . .

DR 9-102 Preserving Identity of Funds and Property of a Client.

(A) All funds of clients paid to a lawyer or law firm shall be deposited in one or more identifiable bank or savings and loan association accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

. . . .

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due *unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.*

(Emphasis supplied.) In his answer, Miller denied that he violated the attorney's oath of office or any disciplinary rules.

This court referred the matter to a referee, who conducted a formal evidentiary hearing and made findings of fact and conclusions of law. Miller attended and was represented by counsel. The referee found that the actions of Miller constituted violations of his oath of office. Specifically, the referee found that Miller did not faithfully discharge the duty mandated by Neb. Rev. Stat. § 7-105(6) (Reissue 1997), which prohibits an attorney from encouraging the commencement of an action from any motive of passion or interest. Also, the referee found a violation of Neb. Rev. Stat. § 7-106 (Reissue 1997) by Miller's acts, determining that he engaged in deceit or collusion with intent to deceive a party to the action. Finally, the referee found that Miller violated all the disciplinary rules (DR 1-102(A)(1) and

(4), DR 2-106(A) and (B), and DR 9-102(A)(2)) for which he was formally charged by the Disciplinary Review Board.

After concluding his findings of fact, the referee recommended disbarment. In his recommendation, the referee noted the previous disciplinary action taken against Miller, *State ex rel. NSBA v. Miller*, 225 Neb. 261, 404 N.W.2d 40 (1987), in which Miller was found to have previously violated DR 1-102 and DR 9-102 by taking money from a client, but he had returned it before the impropriety was discovered. In his report, the referee concluded: "Respondent was given a second chance. He had an opportunity to redeem himself. He failed to do so. He again sought to benefit himself at the expense of his clients. . . . I recommend he be disbarred." Miller filed exceptions to the referee's report, challenging the referee's findings and his recommendation of disbarment.

## I. STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Johnson*, 256 Neb. 495, 590 N.W.2d 849 (1999). The charges against an attorney in a disciplinary proceeding must be established by clear and convincing evidence. *Id.*

## II. ASSIGNMENTS OF ERROR

Miller assigns 10 errors, which can be summarized as follows: First, Miller asserts that the evidence submitted was not sufficient to reach the clear and convincing standard required to find a violation of the Code of Professional Responsibility. Specifically, Miller takes exception to certain findings by the referee, including his finding that Miller filed an unnecessary lawsuit in order to increase his fee, that Miller engaged in fraud or collusion to defraud, that Miller took an excessive fee, and that he withdrew from a trust account his attorney fees with knowledge of an existing fee dispute. Second, Miller alleges

error in the referee's refusal to sequester Sharon as a witness. Third, Miller claims that the referee should not have allowed Hansen to testify as an expert witness regarding the propriety of Miller's fee because Hansen was the attorney for Sharon. Fourth, Miller disputes the referee's exclusion of the exculpatory results of his polygraph examination. Finally, Miller alleges error in the recommendation of disbarment, arguing that such a sanction is inappropriate under these circumstances.

## III. ANALYSIS

As noted in *State ex rel. NSBA v. Johnson, supra,* although we are conducting a de novo review, if there is credible evidence in conflict, this court may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than the other. In this case, there is conflicting evidence concerning the fee arrangement and the existence of a fee dispute.

After a thorough de novo review of the record, we do, in fact, give significant weight to the following findings of fact: The referee determined that Miller orally agreed to represent Sharon for a 20-percent contingent fee; when Brian signed the written fee agreement and questioned the higher fees, Miller informed Brian that it was just a formality and that the real agreement was for 20 percent. On July 19, 1995, Kamil informed Addison that she had an oral understanding with Nurre at MetLife, so that when the Hospital returned the excess payment to MetLife, MetLife would in turn pay the excess payment to Sharon. Upon this information, Addison asked that the Hospital not pay the money to MetLife until he had spoken to Sharon, but neither he nor Miller contacted Sharon about the arrangement. That same day, Miller filed suit in U.S. District Court, without obtaining the express authorization of Brian or Sharon. Miller and Addison later settled the matter with the Hospital without contacting the Bests and waived their claim for interest, attorney fees, and costs.

On or about August 29, 1995, Miller and Addison submitted to the federal court magistrate an order directing the clerk of the court to pay "plaintiff's attorney Addison and Miller, P.C." the funds previously paid into the court by the Hospital. The order

was signed, but Miller did not inform the Bests of the fact of the settlement or that funds had been paid into the court which named Addison and Miller, P.C., as payee instead of the Bests. On September 7, Miller deposited the court's check for $242,737.76 into a trust account. Miller then contacted Brian and asked him to come into his office to sign some papers. When Brian went to Miller's office, Brian refused to sign a settlement statement which provided that Miller would receive 40 percent of the recovery. Brian was not given a copy of the settlement statement, but he told Sharon about the statement. Sharon attempted to contact Miller, to no avail. On September 27, Addison sent Sharon a letter stating that her case was settled and that the attorney fees were $97,095.10. Enclosed with the letter was a check to Sharon for $145,642.66 as her net receipt from the settlement.

Sharon hired Hansen to help her with the fee issue. Hansen notified Miller in an October 2, 1995, letter that his fee with Sharon was in dispute. Hansen advised Sharon to negotiate the check because, although the check to Sharon in fact was written on Miller's trust account, the check itself did not indicate its source. Sharon negotiated the check on October 26. On November 7, without resolution of the fee dispute, Miller withdrew $96,000 in attorney fees from his trust account. On November 27, the NSBA Counsel for Discipline received Sharon's complaint against Miller.

For the reasons that follow, we conclude that the charges levied against Miller concerning §§ 7-105(6) and 7-106, and DR 1-102(A)(1) and (4), DR 2-106(A) and (B), and DR 9-102(A)(2) have been established by clear and convincing evidence. We will address each of Miller's assigned errors in turn.

### 1. SUFFICIENCY OF EVIDENCE

Miller first claims that the evidence presented is not sufficient to show by clear and convincing evidence that he violated the attorney's oath of office or the relevant disciplinary rules.

### (a) Violation of § 7-105(6)

Section 7-105(6) provides that an attorney shall not "encourage the commencement or continuance of an action or

proceeding from any motive of passion or interest." The record establishes that Miller's partner, Addison, informed him, shortly after 2:30 p.m. on July 19, 1995, that an understanding had been reached between the Hospital and MetLife, in which MetLife had promised to pay to Sharon the overpayment it would receive from the Hospital. Notwithstanding this information, at 4:04 p.m. on the same day, Miller filed suit against the Hospital in the U.S. District Court. Miller's justification for filing suit has been consistent throughout the proceedings: He needed to sue quickly before the Hospital returned the money to MetLife because he thought that if MetLife had the money, it would be more difficult for the Bests to obtain the overpayment from the insurance company. This explanation is rather dubious in light of the record we have reviewed.

First, there was absolutely no attempt at negotiating a satisfactory settlement agreement with the Hospital and MetLife (in spite of the Hospital's and MetLife's apparent willingness to do so), which would render the filing of suit unnecessary. During Addison's conversation with Kamil, on July 19, 1995, at 2:30 p.m., Addison was informed that Kamil had an oral understanding with Nurre at MetLife that when the Hospital returned the excess payment to MetLife, then MetLife would in turn pay the excess payment to Sharon. Upon being so informed by Kamil, Addison asked her not to pay the money to MetLife until after Addison had spoken with his client. However, neither Miller nor Addison contacted either Sharon or Brian to advise them of the telephone call with Kamil. Miller further admits that MetLife was not called prior to the time that the lawsuit was filed. Second, in a letter sent by Miller to Sharon dated July 19, Miller enclosed the complaint but failed to mention Addison's conversation with Kamil—and the record reveals no other attempt by Miller to contact Sharon regarding Addison's conversation with Kamil.

In the rush to the courthouse, Miller failed to communicate to the Bests the content or tenor of the July 19, 1995, telephone conversation between Addison and Kamil, and Miller failed to obtain permission from the Bests to file the lawsuit. Miller's questionable rationale for filing an immediate lawsuit does not hold up in light of the evidence. We, therefore, conclude that a

violation of § 7-105(6) has been established by clear and convincing evidence.

### (b) Violation of § 7-106

Section 7-106 provides, "An attorney and counselor who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court, or judge, or a party to an action or proceeding, is liable to be disbarred."

Miller's deceitful acts are demonstrated in several circumstances. In addition to the acts of July 19, 1995, we determine, giving weight to the referee's findings of fact, see *State ex rel. NSBA v. Johnson*, 256 Neb. 495, 590 N.W.2d 849 (1999), that Miller induced Brian to sign the written agreement on July 14, containing a higher percentage of attorney fees, based upon his statement that the oral agreement was 20 percent and that the written agreement was a mere formality.

Second, Miller's utter lack of candor with his clients reveals his deceit. Again giving weight to the referee's findings, Miller waived Brian's claim for interest and settled the suit without obtaining his express permission. Only after a significant time period had elapsed did Miller inform the Bests of the settlement.

Third, Miller has conducted himself in a deceitful manner throughout this disciplinary proceeding. Most revealing of this deceit is his response to the bar complaint and his later testimony, which are riddled with mischaracterizations and nondisclosures.

In his response to the bar complaint, Miller contends that after consulting with Sharon, he performed "extensive research on the issue, including conferences with Joe Jones, whom I consider an insurance law expert. I consulted with a number of attorneys besides Joe Jones, including Bill Gallup and others . . . ." By his own admission, this "extensive research" totaled 5 hours. Additionally, his "conference" with Jones was a 6-minute conversation.

Several nondisclosures and inconsistencies indicate that Miller has changed his story throughout these proceedings. First, conspicuously absent from his response to the bar complaint is a disclosure that before he filed suit on July 19, 1995, Miller knew of the Hospital's understanding with MetLife that

MetLife would refund the money to the Bests. Since this information proved so critical at later stages of the proceedings, its absence from Miller's initial response suggests that he perfected his story to meet the exigencies of the pending proceedings. Rather than disclosing the Hospital conversation, Miller attempted to mislead the Counsel for Discipline in his initial response when he stated: "I attempted to call the attorney for the University of Michigan hospital several times without success, and then filed suit . . . ." Miller admitted in his testimony at the referee's hearing that Addison had reached Kamil and had discussed the case before the suit was filed, and Miller's attempt to explain his response in the letter to the Counsel for Discipline does not ring true.

Additionally, Miller's deceitful conduct is demonstrated by another notable omission in his account of July 19, 1995. In his testimony before the Committee on Inquiry, Miller stated that after Addison informed him of his conversation with Kamil, Miller called Sharon to tell her of Addison's conversation before he filed suit. However, in the later hearing before the referee, Miller claims that he called Sharon on the day he filed suit to discuss the interest issue, but Miller did not assert, as he did earlier, that he disclosed Addison's conversation with Kamil. Miller also fails to mention the Hospital conversation in his July 19 letter to Sharon. In short, we conclude that a violation of § 7-106 has been established by clear and convincing evidence.

### (c) Violation of Disciplinary Rules

The evidence reveals that Miller's conduct in the Best matter also violated several disciplinary rules. He violated DR 1-102(A) by engaging in dishonest, deceitful, and fraudulent conduct. This conduct is most clearly illustrated by the evidence concerning the fee arrangement, the settlement of the lawsuit, and his conduct during the disciplinary proceedings, as previously detailed.

Miller also violated DR 2-106 by charging a clearly excessive fee. A fee is clearly excessive when, "after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." DR 2-106(B). In the instant case, several lawyers of ordi-

nary prudence have deemed this fee to be excessive. These lawyers include those on the Committee on Inquiry, members of the Disciplinary Review Board, Hansen, and the referee of the disciplinary proceedings. Although no singular factor enumerated in DR 2-106(B) is dispositive, particular attention must be directed to certain facts in this matter. It is obvious that Miller spent little time on the Best matter. Between July 3 and 18, 1995, he made seven brief calls to the Hospital. Miller allegedly spent up to 5 hours doing research, but was unable to provide copies of any research notes or cases. Miller informally discussed the issues with other attorneys and spent some time drafting an assignment of proceeds and the complaint. Based upon his efforts, Miller claims entitlement to a $96,000 fee.

The fee cannot be justified by its contingent nature, nor does its contingent nature provide an escape from a judicial review of the fee's reasonableness. See *Kirby v. Liska*, 214 Neb. 356, 334 N.W.2d 179 (1983). In *Kirby v. Liska*, an attorney sought to recover a 30-percent contingent fee earned in relation to a potential quiet title action. After the action was settled, the attorney claimed 30 percent of the recovery for his fees, but the client refused to pay. This court asserted its authority to monitor and determine the reasonableness of a contingent fee contract and did not allow the attorney to recover 30 percent. *Id.* Citing DR 2-106, we noted that the attorney actually performed little work:

> When Kirby accepted employment in the litigation, the case was pending on a motion . . . for summary judgment. The record shows that Kirby examined the record, filed some pleadings, wrote some correspondence, conferred with his client, obtained continuances, drafted a settlement offer, and was present when the settlement agreement was signed. The record before us will not sustain an allowance of $65,340 for attorney fees upon the basis of an express agreement or upon a quantum meruit basis. Such an amount is excessive.

*Kirby v. Liska*, 214 Neb. at 363, 334 N.W.2d at 183.

Similarly, in the instant case, Miller did little work in a relatively unsophisticated case for the $96,000 fee to which he claims entitlement. By his own admission, his total effort in the Best case consisted of several brief telephone calls, a few

research hours, informal discussions with other attorneys, and the drafting of an assignment of proceeds and the complaint. Miller admits in his testimony that the Hospital had no right to the money. These circumstances did not require sophisticated legal effort or expertise. Like the attorney in *Kirby v. Liska, supra*, Miller had minimal work to do, and he did only minimal work. A fee of $96,000 is clearly excessive.

We also find clear and convincing evidence that Miller violated DR 9-102 by withdrawing his fee before the fee dispute had been resolved. DR 9-102 provides that funds which belong in part to the client and in part presently or potentially to an attorney or a law firm must be deposited in a bank account and that the attorney can withdraw the attorney's portion when due, unless the attorney's right to do so is disputed. If a dispute arises, an attorney cannot withdraw the fee until the dispute is resolved. Hansen's October 2, 1995, letter provided Miller with sufficient notice that his fee was being disputed by Sharon. Sharon did cash the check on October 26, and it is only later, on November 7, that Miller withdrew his fee from the trust account. The evidence is in sharp conflict about whether Hansen indicated to Miller that the dispute was resolved. Hansen denies making any such suggestion, but Miller claims that Hansen told him the matter was resolved. The referee heard and observed the witnesses and accepted Hansen's version of the facts rather than Miller's. See *State ex rel. NSBA v. Johnson*, 256 Neb. 495, 590 N.W.2d 849 (1999). Miller's actions have provided no reason for us to find that the referee erred in this determination. Accepting Hansen's version of the facts necessitates a finding that Miller violated DR 9-102 because he withdrew his fees before the matter was resolved.

## 2. REFUSAL TO SEQUESTER SHARON

Next, Miller alleges error in the referee's refusal to sequester Sharon and in allowing her to be present throughout the testimony and to testify as a rebuttal witness. The exclusion or sequestration of a witness is within the discretion of the trial court, and a denial of a sequestration motion will not be overturned absent evidence of prejudice to the defendant. *State v. Bautista*, 193 Neb. 476, 227 N.W.2d 835 (1975). Referees in

disciplinary proceedings have the same type of discretion in determining sequestration motions.

The general rule provides that witnesses may be excluded upon a party's motion or by the court sua sponte. As noted in *Chicago, B. & Q. R. Co. v. Kellogg*, 54 Neb. 138, 141, 74 N.W. 403, 404 (1898), sequestration of witnesses has long been a part of Nebraska law:

> We think the practice of causing unexamined witnesses, except those called as experts, to be sequestered so that they may not hear the testimony of the witness being examined is a good one, as it tends to elicit the truth and promote the ends of justice; but we also think that the decided weight of authority, as well as the doctrine of this court, is that whether the witnesses shall be so sequestered is a matter resting in the discretion of the trial court . . . .

Miller points to Neb. Rev. Stat. § 27-615 (Reissue 1995) to support his claim that Sharon should have been excluded. Section 27-615 provides:

> At the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and he may make the order on his own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

Miller argues that none of the exceptions apply. Further, he asserts that the refusal to sequester Sharon and then subsequently allowing her to testify as a rebuttal witness provided Sharon with the opportunity to "fine tune" her testimony and denied Miller the right to a fair hearing.

We disagree. First, as noted in *State v. Bautista, supra*, Miller must show prejudice for this court to disturb the denial of a motion to sequester. Miller has failed to show prejudice. The initial hearing before the Committee on Inquiry revealed to Miller what Sharon's testimony would likely be at the referee's hearing. Sharon's testimony in both proceedings is substantially the same. Further, there is no evidence that her rebuttal testimony

was "fine tuned" because of her presence during the hearing. Rather, the rebuttal was substantially a mere reiteration of Sharon's previous testimony. This does not constitute prejudice sufficient to find error in the referee's ruling.

Additionally, Sharon falls within the § 27-615(3) exception as an essential witness, and therefore, the referee was correct in excepting her from the sequestration order. Although this court has never ruled on who is an essential witness in a disciplinary case, *State v. Eynon*, 197 Neb. 734, 250 N.W.2d 658 (1977), gives guidance. In *State v. Eynon*, this court affirmed the trial court's decision to allow the victim to remain in the courtroom during the prosecution of the defendant on the charge of burglary with intent to commit rape. We determined that the essential witness exception applied to the circumstance. Similarly, Sharon was an essential witness to this cause because she was Miller's client and was also the complaining witness in the instant cause.

### 3. HANSEN AS EXPERT WITNESS ON EXCESSIVE FEE ISSUE

Miller also alleges error in the referee's decision to allow Hansen, Sharon's attorney, to testify as an expert witness about the excessiveness of Miller's fee. Miller argues that because of his representation of Sharon, Hansen could not testify in any other way about the unreasonableness of the fee. This argument is without merit.

■ The admission of expert testimony is ordinarily within the trial court's discretion and its ruling will be upheld absent an abuse of discretion. *Gittins v. Scholl, ante* p. 18, 601 N.W.2d 765 (1999). The same discretion is accorded to referees, and we find no abuse of discretion in the referee's decision to allow Hansen to testify about the excessiveness of the fee.

■ Four factors govern the admissibility of expert testimony: (1) whether the witness is qualified as an expert, (2) whether the testimony is relevant, (3) whether the testimony will assist the trier of fact, and (4) whether the probative value of the testimony is outweighed by the danger of unfair prejudice or other considerations. *Seeber v. Howlette*, 255 Neb. 561, 586 N.W.2d 445 (1998) (interpreting Neb. Rev. Stat. § 27-403 (Reissue 1995)). Hansen was sufficiently qualified as an expert; he has practiced

law in Omaha for over 29 years, and in recent years, he has focused on the insurance area. Hansen's opinion with respect to the reasonableness of the fee is highly relevant because that fee is a major issue in this disciplinary case. Moreover, his opinion assists the trier of fact in determining that issue, and its probative value is not substantially outweighed by the danger of unfair prejudice. Although Miller claims that Hansen should not have been allowed to testify because of an alleged bias in favor of Sharon, any such bias goes to the credibility of Hansen's testimony, not its admissibility.

#### 4. EXCLUSION OF EXCULPATORY POLYGRAPH EXAMINATION

Miller took a polygraph examination in May 1997, and deception was apparently not indicated when asked questions regarding, inter alia, his motivation behind filing the Bests' suit, the fee agreement made between him and the Bests, and his decision to withdraw his fee from the trust account. The referee sustained the NSBA's motion in limine to exclude the exculpatory polygraph results, and Miller alleges error in that ruling.

The results of polygraph examinations have been held inadmissible in both criminal and administrative proceedings in Nebraska. *Mathes v. City of Omaha*, 254 Neb. 269, 576 N.W.2d 181 (1998). In *Mathes v. City of Omaha*, 254 Neb. at 273-74, 576 N.W.2d at 184, a case involving the admission of inculpatory polygraph evidence in a judicial review of a police personnel decision, we noted: "Such truth and deception examinations are not favored under Nebraska law. . . . [C]ourts must be particularly cautious in according evidentiary status to a polygraph examination since the result 'is unique in that its truth seeking functions nearly duplicate the purpose of the trial.' " In accordance with our established rule of inadmissibility, we determine that the referee did not err in refusing to admit the polygraph evidence.

#### 5. IMPOSITION OF SANCTION

We now address the appropriate disciplinary measures to be taken. To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, this court considers the following factors: (1) the nature of the

offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the offender generally, and (6) the offender's present or future fitness to continue in the practice of law. *State ex rel. NSBA v. Johnson*, 256 Neb. 495, 590 N.W.2d 849 (1999). Each case justifying discipline of an attorney must be evaluated individually in light of the particular facts and circumstances of that case. *Id*. For purposes of determining the proper discipline, we consider Miller's acts both underlying the events of this case and throughout this proceeding. See *id*. Cumulative acts of attorney misconduct are distinguishable from isolated incidents of neglect and therefore justify more serious sanctions. *Id*. Mitigating circumstances are also weighed in determining the proper discipline. *Id*.

The circumstances of this case are inexcusable and warrant the most severe sanction. The nature of Miller's offenses are based in deceitful conduct. The referee in the instant case found that Miller had previously represented both Sharon and Brian and, because of those earlier dealings, the Bests placed their trust and confidence in him. The referee concluded that Brian's trust was such that he accepted Miller's assurance that the 40-percent contingency written agreement was simply a formality and that the 20-percent contingency oral agreement with Sharon was the actual fee agreement. The evidence supports the referee's determination that Miller then deliberately set upon a course of action that violated the Bests' trust and confidence for his own economic gain.

This case does not merely involve the withdrawal of disputed fees from a lawyer's trust account. The withdrawal of the disputed fee was simply the culmination of a series of devious and deceptive actions by Miller that have previously been set forth. Moreover, Miller's mischaracterizations and inconsistencies in the bar proceedings reflect an irreverent attitude toward its interest in promoting ethical conduct.

Additionally, this court has consistently taken into account that cumulative acts of attorney misconduct are distinguishable from isolated incidents and are therefore deserving of more serious sanctions. See, *State ex rel. NSBA v. Johnson, supra*; *State ex rel. NSBA v. Caskey*, 251 Neb. 882, 560 N.W.2d 414 (1997).

We cannot ignore Miller's prior acts in *State ex rel. NSBA v. Miller*, 225 Neb. 261, 404 N.W.2d 40 (1987). In that case, Miller misappropriated slightly more than $19,000 from an estate and paid back the sums of money to the devisees before he was formally charged. At the time, this court made a rather rare exception to the usual rule that conversion of a client's funds requires disbarment. *Id.* Acting upon the recommendation of the referee in that case, and considering the mitigating circumstance of excessive use of alcohol and drug abuse at the time of the misappropriation, we suspended Miller from the practice of law for a period of 2 years.

Lamentably, Miller violated DR 1-102 and DR 9-102 in both the earlier case and the instant case. Because we have a duty to protect the public, to maintain the reputation of the bar as a whole, and to deter others from similar conduct, Miller will not be given another chance. There are no mitigating circumstances favoring a sanction less severe than disbarment.

## IV. CONCLUSION

It is therefore the judgment of this court that James P. Miller be disbarred, effective immediately. Miller is further directed to pay costs in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 1997).

JUDGMENT OF DISBARMENT.

MILLER-LERMAN, J., not participating.